**PANHANDLE PRODUCERS & ROYALTY OWNERS ASSOCIATION,**
Petitioner,

v.

**ECONOMIC REGULATORY ADMINISTRATION,**
Respondent.

**Nos. 87–4146 to 87–4148.**

United States Court of Appeals,
Fifth Circuit.

June 28, 1988.

---

Robert C. Platt, Washington, D.C., Jeffrey G. Shrader, Gibson, Ochsner & Adkins, Amarillo, Tex., for petitioners.

Marc Johnston, Thomas H. Kemp, Marshall A. Staunton, Adm'r, ERA, Washington, D.C., for ERA in Nos. 88–4148 and 87–4147.

Marc Johnston, Thomas H. Kemp, Rayburn Hanzlik, Adm'r, Dept. of Energy, Washington, D.C., for ERA in No. 87–4146.

John R. Staffier, McHenry & Staffier, P.C., John H. Burnes, Jr., George W. McHenry, Jr., Washington, D.C., for Pan-Alberta Gas Ltd., Natgas, Inc., Westcoast Transmiss., Westcoast Resources, Foothills Pipe Lines.

R.V. Loftin, Jr., James A. Porter, Trans. Gas Pipe Line Corp., Transco Energy Market Co., Houston, Tex., Andrews & Kurth, Washington, D.C., for Transcontinental Gas, Transco.

Ernest B. Abbott, Anthony D. Pryor, James Howard, Tennessee Gas Transmission, Houston, Tex., for Tennessee Gas.

Before GARZA, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In each of these three consolidated cases, the Economic Regulatory Administration issued an order authorizing imports of Canadian natural gas despite the objections of petitioner, Panhandle Producers and Royalty Owners Association. PPROA's petition for review raises a number of objections to the ERA's orders, including the validity of certain guidelines issued by the Secretary of Energy in 1984 and their application in these orders. PPROA argues that the ERA's reliance on the guidelines was not proper because they were not the product of rulemaking procedures or submitted for review by the Federal Energy Regulatory Commission before promulgation. We reject these challenges and affirm.

I

The Department of Energy administers section 3 of the Natural Gas Act, which permits the importation of natural gas unless it would "not be consistent with the public interest." *See* 15 U.S.C. § 717b. Before 1977, the "public interest" determination was made by the Federal Power Commission, now known as the Federal Energy Regulatory Commission. After this authority was given to the Secretary of Energy in 1977 under the Department of Energy Organization Act, *see* 42 U.S.C. § 7101 et seq., § 7151(b) (1983), the Secretary delegated it to the Economic Regulatory Administration. *See* DOE Delegation Order No. 0204–54, 44 Fed.Reg. 56,735 (1979); DOE Delegation Order No. 0204–25, 43 Fed.Reg. 47,769 (1978). Until 1984, the ERA considered import applications on a case-by-case basis. The agency placed the burden of proof on the import applicant to demonstrate that the proposal was consistent with the public interest and demanded a showing that the import price was reasonable relative to the prices of alternative fuels. The applicant also had to show that its regional need could not be met by domestic sources and that the imports

would not adversely affect development of domestic supplies. *See generally Panhandle Producers & Royalty Owners Ass'n v. ERA*, 822 F.2d 1105, 1106–07 (D.C.Cir. 1987).

In 1984, the Secretary of Energy called for a change in the policy governing natural gas imports, concluding that the prevailing gas surplus had rendered existing long-term supply arrangements too expensive. On this basis, the Secretary issued a policy statement redefining the "public interest" in terms of three factors: competitiveness of the import, need for the gas, and security of supply. *See* "New Policy Guidelines and Delegation Orders," 49 Fed. Reg. 6684 (1984). The policy statement called for a more market-oriented approach to the approval of gas imports, which it expressed in two rebuttable presumptions: first, that an import contract would be presumed "competitive" if it contained flexible price and volume terms, and second, that a "competitive" import would be presumed to be supported by need. *Id.* at 6687–88. "Thus, with the presumption that commercial parties will develop competitive arrangements, parties opposing an import will bear the burden of demonstrating that the import arrangement is not consistent with the public interest." *Id.* at 6685. The policy statement also said the ERA would continue to consider security of supply, which would encompass factors such as "national security interests" and "international trade policy." *Id.* at 6688. The policy statement was adopted without notice and comment proceedings.

Since the 1984 Guidelines, the ERA has issued at least seventy blanket import authorizations like the ones challenged by PPROA. In general, such orders permit domestic pipelines and their affiliates to import a specified quantity of Canadian gas over a two-year period. *See Tennessee Gas Pipeline Co.*, 1 ERA ¶ 70,674 (Nov. 6, 1986), on rehearing, 1 ERA ¶ 70,684 (Jan. 5, 1987); *Western Gas Marketing U.S.A., Ltd.*, 1 ERA ¶ 70,675 (Nov. 6, 1986); *Enron Gas Marketing, Inc.*, 1 ERA ¶ 70,676 (Nov. 6, 1986). The applicants are not required to identify the sellers of the gas, the markets in which the gas is to be sold, or the

terms of the sale agreements. They need do so only in quarterly reports filed with the ERA after the imports have been received. The D.C. Circuit has upheld a similar order against substantially the same attacks as those presented in this petition. *See Panhandle Producers*, 822 F.2d at 1110–14.

The orders challenged here were sought by gas pipeline companies and affiliates of gas pipeline companies. PPROA, as well as a number of other domestic interests, intervened in the proceedings before the ERA. Although the ERA followed notice and comment procedures in issuing these orders, the ERA cited the 1984 Policy Statement. In particular, the orders noted that it would presume that the application should be granted:

> The Adninistrator [sic] is guided in making his determination by DOE's natural gas import policy guidelines. Under these guidelines, the competitiveness of an import in the markets served is the primary consideration for meeting the public interest test. In asserting that an import should be denied, *an opponent* therefore should persuade the ERA that granting the application would reduce competition in gas markets or would otherwise not be in the public interest.

*Tennessee Gas Pipeline*, 1 ERA ¶ 70,674 at 72,602 (emphasis added).

The bulk of the ERA's discussion in these orders related to PPROA's proposal that the imports be permitted only with the condition that the imports be transported solely by pipelines that are "open-access" carriers under a provision known as the FERC Order No. 436, 50 Fed.Reg. 42,408 (1985). *See* "Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol," FERC Statutes & Regulations (CCH) ¶ 30,665 (1985), *vacated and remanded, Associated Gas Distributors v. FERC*, 824 F.2d 981, 993–997 (D.C.Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988). Under this program, pipelines voluntarily agree to be certified as "open-access" carriers who provide transportation for customers on a first-come, first-served basis, even though such customers may be marketing gas in competition with gas sold by the pipeline carrier. *See generally Associated Gas Distributors*, 824 F.2d at 993–997. None of the applicants here is certified as an open-access carrier. The ERA rejected PPROA's proposal in a thorough discussion, finding that it would unduly discriminate between the treatment of imported and domestic gas, and would impose an additional regulatory burden on the parties to an import contract.

## II

PPROA makes a variety of arguments against the ERA's reliance on the Secretary's 1984 Guidelines. The arguments fall into two basic categories. First, PPROA argues that the Guidelines were adopted and implemented without certain procedural requirements contained in the Natural Gas Act and the Administrative Procedure Act. Second, PPROA argues that even if the Guidelines were adopted validly, it was inappropriate to apply them in the circumstances of these applications. Neither attack is persuasive.

### A

PPROA first contends that the ERA's use of the 1984 Guidelines suffered from two procedural flaws: that the Guidelines are invalid altogether because the Secretary of Energy issued them without following required procedures; and that the ERA could have relied on the Guidelines only if they had been adopted through rulemaking procedures.

1. *The Referral Requirement.* PPROA contends that the Secretary was required by a federal statute, 42 U.S.C. § 7174, to refer the policy statement to the FERC for review. This section provides that the Secretary must notify the FERC of any "statements of policy of general applicability" that are to be issued within a function formerly exercised by the Federal Power Commission. The FERC then determines, "in its discretion," whether the proposed action "may significantly affect any function within the jurisdiction of the Commission" as it is defined by 42 U.S.C. § 7172.

If the FERC determines that the action would have such an effect, the Secretary "shall immediately" refer the matter to the FERC and the FERC "shall provide an opportunity for public comment." The FERC can concur in the statement, suggest modifications, or recommend it not be adopted. The FERC's opinion has considerable binding effect, for § 7174(c) permits the Secretary only either to accept the FERC's recommendation or to order that the rule not be issued at all. In short, the Secretary may not adopt a statement of policy that the FERC has rejected.

Before we may reach the merits of this issue, we must deal with two threshold questions: whether PPROA adequately preserved the argument for review, and whether PPROA has standing to make it at all. The D.C. Circuit did not decide the referral argument because it concluded that PPROA failed adequately to raise it in its petition for rehearing before the ERA, a statutory prerequisite for review by this court.[1] In this case, PPROA's rehearing petition included the following objection:

> The subject orders erred: (1) by relying upon the February 22, 1984 Statement of Policy, which is a legal nullity that was not promulgated in accordance with the requirements of the Administrative Procedure Act *and the DOE Organization Act.* (Emphasis added).

In the discussion, PPROA contended that the guidelines could be valid only if promulgated as a "substantive rule" through the rulemaking proceedings in APA § 553. The petition then said:

> In addition, were ERA to institute such a rulemaking, it would have been obligated under Section 404 of the Department of Energy Organization Act (DOE Act), 42 U.S.C. Section 7174, to place the proposed rule before the Federal Energy Regulatory Commission.... Under [§ 7174], the Commission would provide its own opportunity for comment. The

clear intent of [§ 7174] was to give the Commission, and not the ERA, supremacy in assuring a consistent regulatory approach to all matters subject to the Natural Gas Act.

■ The D.C. Circuit found similar language insufficient to preserve the referral objection:

> Petitioner's rehearing petition mentions § 7174, but argues only that *if* the Secretary had promulgated the Policy Statement as a *substantive rule,* he would have been required to comply with that section. As we find that the ERA was entitled to rely on the Policy Statement without substantive rulemaking, petitioner's reference to § 7174 is irrelevant. Until its reply brief before us, petitioner never contended that the agency was required by § 7174(a) to refer a *policy statement* to the Commission.

*Panhandle Producers,* 822 F.2d at 1108 n. 1 (citation omitted) (emphasis retained). Although analytically defensible, we find this reading of the rehearing petition too narrow. Because the petition discussed the purpose of § 7174, we construe it to have raised the issue of whether the policy statement required referral. PPROA thus has preserved the question for our consideration.

■ A more difficult problem for PPROA is the question of standing.[2] As we have recognized, an "aggrieved party" has standing to challenge administrative action only if the party has suffered "injury in fact" to an interest "arguably within the zone of interests" protected by the underlying statute. *See Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 639–40 (5th Cir.1983). These requirements are lacking here. Most important, PPROA's interest falls outside the zone of interests sought to be protected by the referral provision. While PPROA offers some legislative history indicating that § 7174's public

---

1. "No objection to the order of the Commission shall be considered by the court [of appeals] unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do." 15 U.S.C. 717r(b).

2. Although the D.C. Circuit did not fully explore the question, the court noted its doubt about PPROA's standing to assert the referral requirement. *See Panhandle Producers,* 822 F.2d at 1108 n. 1.

comment requirement was the product of congressional fear that the Secretary would trample on the FERC's jurisdiction, this does not persuade us that Congress intended to give remotely affected individuals the right to bring a challenge on the FERC's behalf. The statute offers no indication that Congress intended for the courts to mediate a turf war between the two agencies. Behind the word "standing" there always lurks the basic question of who decides; whether accommodation is to be achieved politically or by judicial decree.

We also find it hard to imagine what cognizable injury PPROA could have sustained from the lack of referral. In fact, in an amicus brief filed with the D.C. Circuit, the FERC said that it had been consulted informally before issuance of the Guidelines and chose not to press for § 7174 referral. *See also* "New Policy Guidelines," 49 Fed.Reg. at 6686 (noting that 1984 Guidelines were the result of "interagency review" by the Department of Energy, the FERC, and the State Department). In all likelihood, then, the FERC would not have requested referral even if given the opportunity, and because the decision would have been discretionary, PPROA could not have forced the FERC to do so. Furthermore, even if the FERC had insisted on referral, PPROA can only speculate that the FERC would have asked for modifications to PPROA's benefit. Because PPROA has no standing to seek enforcement of the referral requirement, we need not consider the merits of the issue.[3]

*2. Reliance on the 1984 Guidelines as a Substantive Rule.* Assuming the policy

guidelines need not have been referred to the FERC, PPROA also argues that the ERA improperly gave them the force of a substantive rule. In essence, PPROA argues that either the policy statement is actually a "rule" within the meaning of the Administrative Procedure Act and effective only if issued in compliance with rulemaking procedures, or it is merely a policy statement that the ERA could not rely upon whatsoever. The ERA admits that the policy statement was not issued in compliance with APA § 553(a), which requires notice and comment procedures for issuance of "rules."[4]

PPROA bases its argument on *Pacific Gas & Electric Co. v. FPC,* 506 F.2d 33 (D.C.Cir.1974), in which natural gas purchasers directly attacked an FPC policy statement setting forth priorities for curtailment of gas deliveries. The D.C. Circuit explained the difference between substantive rules and statements of policy:

> A properly adopted substantive rule establishes a standard of conduct which has the force of law. In subsequent administrative proceedings involving a substantive rule, the issues are whether the adjudicated facts conform to the rule and whether the rule should be waived or applied in that particular instance. The underlying policy embodied in the rule is not generally subject to challenge before the agency.
>
> A general statement of policy, on the other hand, does not establish a "binding norm." It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or

---

**3.** We note that even with standing, PPROA's referral argument would be a difficult one to accept. It would have made little sense for ERA to refer the policy statement to the FERC because the statement dealt with issues largely removed from the FERC's jurisdiction. While § 7174 leaves it to the FERC's "discretion" to decide whether a proposed policy statement will affect the FERC's functions as defined in § 7172, the statute removes natural gas imports from the FERC's purview. *See* 42 U.S.C. § 7172(f) ("No function described in this section which regulates the exports or imports of natural gas or electricity shall be within the jurisdiction of the Commission unless the Secretary assigns such a function to the Commission.").

This limitation on the FERC's jurisdiction would have little meaning if the FERC could demand referral and modification of any policy statement the FERC believed affected its other functions. On the other hand, the FERC undoubtedly has some interest in the decision to authorize an import, at least insofar as the imported gas is to be distributed through the pipeline system the FERC regulates and may be sold in competition with domestic gas supplies the FERC oversees.

**4.** Under the APA, a rule is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy...." 5 U.S.C. § 551(4).

rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy. A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued. An agency cannot escape its responsibility to present evidence and reasoning supporting its substantive rules by announcing binding precedent in the form of a general statement of policy.

*Id.* at 38–39 (footnotes omitted).

██ The question, then, is whether the ERA gave the 1984 Guidelines the force of a rule or the force of a policy statement. On the basis of our reading of the orders, we agree with the D.C. Circuit that the ERA did not treat the Guidelines as establishing a "binding precedent." *See Panhandle Producers,* 822 F.2d at 1111. Even though the ERA looked to the Guidelines for presumptions and burdens of proof, the ERA responded fully to each argument made by opponents of the order, without merely relying on the force of the policy statement. *See Ryder Truck Lines, Inc. v. United States,* 716 F.2d 1369, 1377 (11th Cir.1983) (stating that a policy statement does not become a "substantive rule" merely because it establishes presumptions to be applied in later proceedings), *cert. denied,* 466 U.S. 927, 104 S.Ct. 1707, 80 L.Ed. 2d 181 (1984); *Guardian Federal Savings & Loan v. FSLIC,* 589 F.2d 658 (D.C.Cir. 1978) (same).

██ We also reject PPROA's contention that because the Guidelines do not establish substantive rules, the ERA was bound to ignore them altogether. As the D.C. Circuit aptly explained, the fact that a nonbinding policy statement must be considered "subject to complete attack" before being applied in particular cases does not mean that such a statement must be ignored *entirely* in those cases. *See Panhandle Producers,* 822 F.2d at 1111 (distinguishing *Pacific Gas* ). The presumptions set forth in the 1984 Guidelines have been subject to complete attack in the scores of import applications considered by the ERA since 1984. *See, e.g., Northwest Alaskan Pipeline Co.,* 1 ERA ¶ 70,585 (1985); *Cabot Energy Supply Corp.,* 1 ERA ¶ 70,124 (1985). The ERA did not give the Guidelines undue weight by refusing endlessly to reconsider the principles established in those cases. As for the arguments raised for the first time in these applications—in particular, the proposed open-access provision—the ERA's consideration was thorough and fair; the ERA proceeded on these issues as if the Guidelines were subject to "complete attack."

██ We find little merit as well in PPROA's argument that the ERA has violated its own regulations governing the form of import applications. *See, e.g., Sierra Club v. Sigler,* 695 F.2d 957, 967 (5th Cir.1983) (stating that an agency must follow its own regulations). The ERA regulations set forth a list of topics that are to be discussed in an import application. These topics include, among others, the quantity of gas to be imported in each transaction, the date of the transaction, the seller, and the price. *See* 10 C.F.R. § 590.202 (1988). Contrary to PPROA's reading of the rule, however, discussion of the listed matters is not mandatory; rather, an application need cover such issues only "to the extent applicable." *Id.* Under the substantive policies the ERA has adopted, the listed issues are no longer applicable, so they need not have been discussed.

B

Relying on *West Virginia Public Services Commission v. United States Department of Energy,* 681 F.2d 847 (D.C.Cir. 1982), PPROA also argues that, as a factual matter, the ERA has not adequately justified its departure from the established policy—prior to the 1984 Guidelines—of placing the burden of proof on the applicant to show that imports are consistent with the public-interest provision of the Natural Gas Act. In *West Virginia,* the ERA had approved imports of liquified natural gas solely on the basis of a general finding of an increased national need for

such energy supplies. The D.C. Circuit, applying "substantial evidence" review, found no evidence in the record to support the need projection. *Id.* at 862. In addition, the court found that the ERA's focus departed from its prior practice of requiring the applicant to show a *regional* need for the gas. *Id.* at 860.

■ Obviously, an administrative agency may change its substantive policy in the course of deciding an individual case, so long as the agency adequately explains its reasons for so doing. *See State of Texas v. United States,* 756 F.2d 419, 427 (5th Cir.), *cert. denied,* 474 U.S. 843, 106 S.Ct. 129, 88 L.Ed.2d 106 (1985). As the D.C. Circuit held in *Panhandle Producers,* the presence of such an explanation here distinguishes this case from *West Virginia:*

> Here, by contrast [to *West Virginia*], ERA has both acknowledged and provided a "reasoned analysis" for its departure from precedent. *Motor Vehicle Manufacturers Association of the United States v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 57 [103 S.Ct. 2856, 2874, 77 L.Ed.2d 443] (1983) (citation and internal quotes omitted). The Policy Statement on which it relies identified the disastrous consequences flowing from the policy embodied in Delegation Order No. 0204–54 and formulated a replacement that ERA has consistently applied ever since. *See, e.g., U.S. Natural Gas Clearinghouse, Ltd.,* 1 E.R.A. ¶ 70,602, at 72,420–22 (1985); *Dome Petroleum Corp.,* 1 E.R.A. ¶ 70,601, at 72,416–17 (1985); *Tenngasco Exchange Corp.,* 1 E.R.A. ¶ 70,596, at 72,401–03 (1985); *Northwest Alaskan Pipeline Co.,* 1 E.R.A. ¶ 70,585, at 72,-367–69 (1985); *Cabot Energy Supply Corp.,* 1 E.R.A. ¶ 70,124, at 70,761–62 (1985).

*Panhandle Producers,* 822 F.2d at 1113.

Moreover, the ERA's revised import policy was based on a reasonable interpretation of the Natural Gas Act. Unlike PPROA, we do not read *West Virginia* to foreclose the use of the presumptions set forth in the 1984 Guidelines. The *West*

*Virginia* court noted that the ERA had placed the burden of proof on the applicant before 1982; it did not hold that the ERA was *required* to do so by any provision of the Natural Gas Act. Indeed, the court said that authorization of an import is to be presumed appropriate under section 3. *See West Virginia,* 681 F.2d at 856 (citing *Cia Mexicana de Gas v. FPC,* 167 F.2d 804 (5th Cir.1948)). The 1984 Guidelines only set forth a more specific application of that principle.

### III

■ Beyond its objections to use of the 1984 Guidelines, PPROA's principal contention before the agency was that the import authorizations should have been issued only on the condition that each applicant comply with the "open-access" provision in FERC Order No. 436. The FERC adopted this order in 1985 as a response to the market power of pipeline companies that purchase gas at the wellhead and transport it for sale in other states. The FERC determined that such carriers often refuse to transport gas for third-parties when such gas will be sold in competition with the pipeline's own product. As a remedy, Order 436 made new blanket certification of a pipeline conditional on the pipeline's promise to provide transportation for third-parties on a non-discriminatory basis. *See generally Associated Gas Distributors,* 824 F.2d at 996; *see also Wagner & Brown v. ANR Pipeline Co.,* 837 F.2d 199, 204–05 (5th Cir.1988).

PPROA contends that the "blanket certification of any gas import should also be subject to the requirements of Order 436." Because each applicant here is a pipeline or pipeline affiliate, PPROA predicts that they will transport their own Canadian gas over interstate pipelines to the exclusion of domestically produced gas that might compete with the imports.

We believe that on the basis of the facts in the record, the ERA's refusal to impose an open-access requirement was supported by "substantial evidence." *See Transwestern Pipeline Co. v. FERC,* 820 F.2d 733, 738 (5th Cir.1987), *cert. denied,* —— U.S.

——, 108 S.Ct. 696, 98 L.E.2d 648 (1988). In particular, it is evident to us as it was to the ERA that there is no greater potential for discrimination in the distribution of imported gas than currently exists in the distribution of domestic gas. PPROA has not shown that affiliate relationships are more prevalent among transporters of imported gas than among transporters of domestic gas. We can only conclude, then, that a purchaser of Canadian gas faces no fewer obstacles in bringing its gas to market than does a domestic seller. Hence, there is no reason to doubt the ERA's conclusion that a special "open-access" requirement for imports "would discriminate against foreign supplies of gas and those seeking to import this gas and it would lessen competition in the market-place." *Tennessee Gas*, 1 ERA ¶ 70,674 at ¶ 72,605.

We also find little merit in the other conditions proposed by PPROA but rejected by the ERA. PPROA first argues that the ERA should have imposed as a condition of the authorization that the applicant not enter into an import contract having a two-part price structure. Under such a price arrangement, the purchaser agrees to pay for a certain minimum volume of gas even if that quantity is not actually taken. In the 1984 Guidelines, the Secretary of Energy noted that similar "take-or-pay" provisions in long-term supply contracts had contributed to high-price conditions in the natural-gas market. *See* "New Policy Guidelines," 49 Fed.Reg. at 6684. Arguably, if take-or-pay provisions were included in import contracts made pursuant to the present orders, the sacrifice in flexibility might undermine the asserted benefits of the ERA's market-oriented approach.

Nevertheless, we find the ERA's analysis adequate to support rejection of the proposed condition. As the agency pointed out,

> Although a two-part rate may be possible, it is not likely to be used in the spot market transactions contemplated by Western. The purpose of blanket authorizations and the ERA's approval thereof is to allow the parties to agree to con-

tract terms that best meet their economic needs. An action such as that requested by [PPROA] would be contrary to the freely negotiated nature of blanket arrangements.

*Western Gas Marketing*, 1 ERA ¶ 70,675 at ¶ 70,616–17. Moreover, the ERA could reasonably have concluded that even if take-or-pay provisions were used, the two-year limitation on each authorization would protect against the kind of long-term price distortions criticized in the 1984 Guidelines.

We also do not agree with PPROA's conclusion that the ERA was derelict in declining to impose some sort of limitation on the applicant's profits from the authorized imports. PPROA claims that because the ERA's orders permit the applicants to import gas not only on behalf of themselves but also on behalf of unnamed third parties, the applicants may retain an unregulated brokerage fee at the expense of gas consumers. The ERA's statutory duty to protect the "public interest," the argument goes, required dislosure of such fees and, if they were unreasonable, their limitation.

We find the argument adequately answered by the analysis underlying the ERA's post-Guidelines approach. PPROA offers no reason to doubt that spot-market transactions will occur only under competitive terms. Because the ERA's policy is to grant blanket authorizations routinely, it is of little consequence that the applicant may resell—or "broker"—the authorization so long as the applicant complies with the reporting requirements of the order. The applicants and their agents will face competition from others obtaining the ERA authorizations, making it unlikely that the applicants can reap supracompetitive profits.

The final condition rejected by the ERA would have imposed an additional limitation on the duration of the import authorization. Although as issued each order limits the duration of import authority to two years, this period does not begin to run until the date of first delivery. Hence, PPROA argues, it is possible that the authorization may be used after the market circumstanc-

es presently justifying the order are no longer present.

In our view, this argument misperceives the ERA's analysis. The ERA's present import policy does not depend upon any transitory circumstance in the market for natural gas. Rather, as the 1984 Guidelines explained, the ERA has determined that prior regulatory policies contributed to undesireable market distortions. The more relaxed regulatory approach to short-term import arrangements thus does not seek to correct any prevailing deficiency that might expire with time.

### IV

■■■ The ERA did not provide a trial-type hearing on PPROA's objections to the import orders. PPROA contends that such hearing was necessary in seven areas: (1) the effect of the order on national security objectives; (2) the identity of suppliers and purchasers; (3) the needs of specific markets; (4) whether the price includes broker's fees and is within the public interest; (5) the effect on competition; (6) allocation of capacity at border facilities; and (7) the importer's "acquisition of system supplies." The agency offered the following justification for its decision:

> Apart from the last issue, which concerns the FERC's voluntary Order 436 program and which was discussed above in this order, all other issues allegedly in dispute bear on the general nature of blanket import arrangements. These issues do not involve adjudicative facts but rather are matters of policy.

*Tennessee Gas,* 1 E.R.A. at ¶ 72,606.

Presented with the first four of PPROA's issue areas, the D.C. Circuit found that none required a trial-type hearing under the standard contained in the ERA regulations. *See Panhandle Producers,* 822 F.2d at 1113–14. Those regulations read:

> The Administrator ... shall grant a party's motion for a trial-type hearing, if the Administrator ... determines that there is a relevant and material factual issue genuinely in dispute and that a trial-type

hearing is necessary for a full and true disclosure of the facts.

10 C.F.R. 590.313(a) (1988).

Whether or not the order required resolution of adjudicative facts depends largely upon the extent to which the ERA was entitled to rely on the 1984 Policy Guidelines and its prior orders authorizing similar imports. Because we have determined that the ERA's reliance on established principles was proper, PPROA had the burden of raising a fact issue. Most of the issues pressed by PPROA (such as identity of suppliers, needs of specific markets, and the reasonableness of prices) are of less importance under the approach adopted by the ERA in its post–1984 orders. As for the other issues, such as "competitiveness," PPROA points to no evidence that would tend to rebut the analysis and presumptions contained in the 1984 Guidelines. The ERA noted explicitly that the contracts authorized here were to be flexible as to volume and price, which would support the inference of competitiveness. Finally, on the issues of facility capacity and system supply, PPROA simply fails to explain in any detail the evidence that would justify a full hearing. Nor does PPROA demonstrate why such issues ought to be adjudicated by the ERA rather than the FERC, the agency charged with regulating distribution.

■■■ Contrary to PPROA's assertion, the fact that hearings have been required in other cases involving the Natural Gas Act, *see Distrigas Corp. v. FPC,* 495 F.2d 1057, 1066 (D.C.Cir.), *cert. denied,* 419 U.S. 834, 95 S.Ct. 59, 42 L.Ed.2d 60 (1974); *General Motors Corp. v. FERC,* 656 F.2d 791, 798 (D.C.Cir.1981), does not mean that a hearing is required for every order decided under section 3. Rather, a hearing is required only when it would tend to enhance the accuracy of decisionmaking; that is, only for determinations of adjudicative facts. *See General Motors,* 656 F.2d at 795 & n. 7 (noting that it is "well established" that the "FERC need not hold an evidentiary hearing when no issue of material fact is in dispute"). We are satisfied

that no such determination was necessary for these orders.

## V

 PPROA's final challenge is that the ERA should have completed an environmental assessment to determine whether an environmental impact statement was necessary pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.* Under Department of Energy procedures applicable to the ERA, an agency action is classified into one of three categories for the purposes of environmental issues. Where it is clear that no significant impact will occur, a memorandum to the file is prepared to this effect; where the potential for impact is clear, an environmental impact statement is prepared as a matter of course; where the potential impact is uncertain, a preliminary report—known as an environmental assessment—analyzes the need for an EIS.

Here the ERA considered the environmental impact of its order only in a brief memorandum to the file. PPROA objects to the following explanation the ERA gave:

> Section D of the DOE NEPA guidelines lists the granting of import licenses under Section 3 of the Natural Gas Act as an action which normally requires an [environmental assessment]. This reflects DOE's conservative approach in categorizing actions which may have the potential for impacts. However, the operative word for applying this section of those guidelines in this case is "normally," and actions treated differently than the categories established in Section D are required to be individually examined.

*Tennessee Gas,* 1 ERA ¶ 70,684 at 72,648. The ERA went on to conclude that because the import proposal did not involve construction of any new pipelines, the only effects would be socioeconomic; because such issues generally are outside the concern of NEPA, ERA found no need for an environmental assessment. *Id.; see also Olmstead Citizens for A Better Community v. United States,* 793 F.2d 201, 205 (8th Cir.1986) (socioeconomic effects alone do not justify environmental impact statement). PPROA has offered no serious reason why this conclusion should be doubted.

AFFIRMED.