**INDEPENDENT PETROLEUM ASSOCIATION OF AMERICA, Petitioner,**

v.

**ECONOMIC REGULATORY ADMINISTRATION,**
**Respondent.**

**No. 88–4047.**

United States Court of Appeals,
Fifth Circuit.

March 15, 1989.

---

7. *McWilliams,* 804 F.2d at 1402–03.

8. *Id.* at 1403.

Robert C. Platt, Gary J. Klein, Washington, D.C., for petitioner.

Thomas Kemp, Rayburn Hanzlik, Marc Johnston, Henry A. Gill, Jr., Admin., Dept. of Energy, Washington, D.C., for respondent.

Before CLARK, Chief Judge, BROWN and JOHNSON, Circuit Judges.

CLARK, Chief Judge:

The Economic Regulatory Administration (ERA) issued an order authorizing Texas Eastern Transmission Corporation (Texas Eastern) to continue to import from Canada up to 75,000 Mcf of natural gas per day through October 31, 2000. On petition for review the Independent Petroleum Association of America ("IPAA") raises a number of objections to the ERA's order. We affirm.

## I.

Texas Eastern is a pipeline system which purchases gas from Canadian and domestic producers and pipelines. In 1979, Texas Eastern executed a long-term contract with ProGas Limited (ProGas), a Canadian broker, for the purchase of Canadian gas. The ERA provided Texas Eastern with authority to import up to 75,000 Mcf per day through October 31, 1987.

Texas Eastern and ProGas entered into a new long-term contract in November, 1986, which was amended on July 9, 1987. Under the terms of this contract, Texas Eastern is required to purchase a minimum annual quantity of gas from ProGas. The minimum annual quantity is based on the daily contract quantity of 75,000 Mcf of natural gas but is subject to reductions based upon sales under a special marketing agreement, and to overall reductions to maintain the ratio of domestic natural gas purchased by Texas Eastern. The special marketing agreement provides that imported gas which is not purchased by Texas Eastern's long term contract customers can be redirected for sale on the "spot market." The contract provides that gas will continue to be priced under a two-part demand-commodity rate structure that contains both price adjustment and price renegotiation provisions.

On July 14, 1987, Texas Eastern requested the ERA to extend its import authorization from November 1, 1987 through October 31, 2000. The IPAA intervened with other associations seeking discovery, dismissal, an evidentiary hearing, or conditions on the authorization. On October 30, 1987 the ERA issued Opinion and Order No. 202 extending Texas Eastern's import authorization until October 31, 2000 in accordance with the amended contract. Texas Eastern Transmission Corp., 1 ERA ¶ 70,733 (Oct. 30, 1987). The order limited authorization of the special marketing agreement to a period of two years, and denied the requests for dismissal, discovery, a hearing, and conditions. IPAA and other associations submitted an application for rehearing and a request for stay, which the ERA denied in Opinion and Order 202–A. Texas Eastern Transmission Corp., 1 ERA ¶ 70,744 (Dec. 30, 1987). IPAA petitions for review of the ERA's order.

## II.

The IPAA raises several challenges to the ERA's orders, most of which were raised and rejected in Panhandle Producers & Royalty Owners Ass'n v. Economic Regulatory Administration, 847 F.2d 1168 (5th Cir.1988). IPAA's attempts to distinguish Panhandle on factual and procedural grounds are unpersuasive, and our decision in Panhandle obviates any need for an extensive discussion of the challenges in this case.

Initially, IPAA argues that the ERA improperly relied on the presumptions of competitiveness and need provided by the natural gas import policy guidelines created by the Department of Energy (DOE) in 1984 (1984 Guidelines). See 49 Fed.Reg. 6684 (1984). IPAA alleges that the 1984 Guidelines were improperly promulgated

because the Secretary of Energy did not refer the guidelines to the Federal Energy Regulatory Commission (FERC) for review. We do not reach this issue because the IPAA lacks standing to raise it. *See Panhandle*, 847 F.2d at 1173–74.

■ IPAA also argues that the ERA cannot rely on the 1984 Guidelines because they are based on erroneous assumptions. However, the 1984 Guidelines were issued following extensive review including oral and written public comments, and have been consistently applied by the ERA and upheld by this court in *Panhandle*. We reject this challenge.

■ IPAA next argues that the ERA improperly gives the 1984 Guidelines the force of a substantive rule. We rejected this identical argument in *Panhandle*. *Id.* at 1174–75. As in *Panhandle*, the ERA in Opinions 202 and 202–A did not give the 1984 Guidelines undue weight. The ERA looked to the guidelines for presumptions and burden of proof, but responded to each argument made by opponents of the orders without merely relying on the force of the guidelines.

■ IPAA also argues that the 1984 Guidelines should have no effect on the evaluation of an application. This argument was also raised and rejected in *Panhandle*. *Id.* at 1175. As in *Panhandle*, the ERA in the instant case thoroughly and fairly considered Texas Eastern's application and proceeded as if the guidelines were subject to complete attack.

IPAA also asserts that the ERA improperly failed to follow its own regulations by not requiring Texas Eastern to file all the information called for by 10 C.F.R. § 590.202. As in *Panhandle*, however, the application filed by Texas Eastern in this case complied with the regulatory filing requirements "to the extent applicable." *Id.* at 1175.

■ IPAA next argues that the ERA should have made an environmental assessment to determine whether an environmental impact statement was required. As in *Panhandle*, however, the ERA in this case properly concluded that no environmental

assessment was needed and therefore satisfied regulatory requirements by writing a memo to the file. *Id.* at 1179.

■ IPAA next asserts that the ERA should have permitted discovery from Texas Eastern. The ERA found that IPAA's discovery requests "either related to matters adequately ventilated in this proceeding or to matters not relevant in a public interest determination under the DOE guidelines." 1 ERA ¶ 70,744 at 72,803. IPAA offers no reason why this conclusion is wrong, and we therefore reject the challenge.

■ Relying on *West Virginia Public Services Commission v. United States Department of Energy*, 681 F.2d 847 (D.C. Cir.1982), the IPAA next argues that the ERA has not adequately justified its departure from the pre–1984 policy of placing the burden of proof on the applicant to show that imports are consistent with the "public interest" provision of the Natural Gas Act. This argument was also raised and rejected in *Panhandle* because *"West Virginia* [does not] foreclose the use of the presumptions set forth in the 1984 Guidelines." *Panhandle*, 847 F.2d at 1176. We likewise reject the challenge here.

■ IPAA next argues that the presumption of competitiveness and need was rebutted by David W. Wilson, who stated that the import agreement is non-competitive due to a) high cost of gas; b) two-part rate structure; c) lack of open access transportation; d) minimum annual import requirements; e) lack of contract flexibility; and f) the interaction of numerous economic factors. The ERA responded to Wilson's statements by explaining:

The public interest inquiry into the competitiveness of an import, and resulting presumption of need if an import is found to be competitive, focuses on whether the negotiated arrangement, taken as a whole, provides the importer with the ability to compete in the marketplace, and with the flexibility to respond to market changes and thereby enhance competitive pressure on market participants. It does not focus on the competi-

tive effect of an arrangement upon domestic producers, or on whether the gas can be supplied more economically by domestic or other suppliers in a particular instance. 1 ERA ¶ 70,744 at 72,801. The ERA then concluded that the contract as a whole provided Texas Eastern with the ability to compete in the market place and did not unreasonably restrict the ability of the parties to respond to market conditions because it a) allows for reductions in the minimum import requirements; b) grants credits for spot market sales; and c) allows for price adjustments and market-driven renegotiations of the pricing provisions. As a result, the ERA found that the imported gas would be competitive and needed. Because this finding is supported by substantial evidence, we affirm. *See Panhandle*, 847 F.2d at 1176.

■ IPAA next objects that an environmental memo, Texas Eastern's original contract, and two prior ERA orders were included in the record without service or notice or an opportunity to comment. Without deciding that IPAA has shown it was prejudiced, we do not reach this issue because IPAA failed to make this objection before the ERA. *See* 15 U.S.C. 717r(b).

■ IPAA argues here that the ERA relied on extra record data in determining price levels under the contract. Assuming that IPAA's placement of a reference in a footnote to its application for rehearing before the ERA preserved this argument, we reject it as meritless. The price levels specified in ERA's order were taken directly from information submitted by Texas Eastern in connection with its application, which was published at 52 Fed.Reg. 33,266 (1989). This was also included in the administrative record.

■ IPAA next argues that the ERA erred in interpreting the pricing formulas submitted by Texas Eastern. However, any error was harmless because ERA took the ultimate price levels as of August 1, 1987 directly from the information submitted by Texas Eastern in connection with its application. In addition, the ERA appropriately noted that its analysis of com-

petitiveness under the 1984 Guidelines focuses on the flexibility of the contract as a whole, not on whether gas can be supplied more economically by domestic producers in a particular instance. 1 ERA ¶ 70,744 at 72,801.

■ IPAA next argues that the ERA improperly concluded that the imported gas will be subject to competition in the absence of open access transportation. A similar argument was raised and rejected in *Panhandle*. 847 F.2d at 1176–77. As in *Panhandle*, we find that the ERA's finding of competitiveness in this case is supported by substantial evidence. Indeed, as in *Panhandle*, there is no reason to doubt the ERA's conclusion that "to require imported gas to be transported over open access pipelines would unfairly discriminate against foreign supplies and lessen competition." 1 ERA ¶ 70,733 at 72,765.

■ IPAA also argues that the authorization of the special marketing agreement permits Texas Eastern to import gas on behalf of unnamed third parties, which may result in lack of competition. A similar argument was raised and rejected in *Panhandle*. *Id.* at 1177. As in *Panhandle*, IPAA offers no reason to doubt that spot market transactions will occur only under competitive terms since Texas Eastern and its "agents" will face competition from others obtaining ERA authorizations.

■ IPAA next argues that the ERA erred by not holding a trial-type hearing on disputed issues. This argument was also raised and rejected in *Panhandle*. *Id.* at 1178–79. "[A] hearing is required only when it would tend to enhance the accuracy of the decisionmaking; that is, only for determinations of adjudicative facts." *Id.* at 1178. Since the ERA is entitled to rely on the presumptions set forth in the 1984 Guidelines, the burden is on the petitioner requesting a hearing to raise a fact issue. *Id.* The ERA in this case specifically found that there was no need for a trial-type hearing because IPAA's "concerns reflect a different policy perspective, not a factual dispute regarding competitiveness." 1 ERA ¶ 70,733 at 72,766. Here, as in *Pan-*

*handle,* the ERA properly concluded that no hearing was necessary.

 IPAA next argues that ERA's approach of presuming competition leaves the public unprotected because of a regulatory gap. While the objection appears meritless we need not reach it because it was not adequately raised before the ERA in the application for rehearing. *See* 15 U.S.C. § 717r(b).

 IPAA finally argues that the ERA should have issued the authorization order only on the conditions that the pipelines transporting the imported gas be "open access" transporters, and that ProGas' two-part rate be eliminated. These identical conditions were proposed and rejected in *Panhandle. Id.* at 1176–77. As in *Panhandle,* we find that in the instant case the ERA's refusal to impose these conditions is supported by substantial evidence.

ERA's Opinions and Orders 202 and 202–A are

AFFIRMED.