**KANSAS CITY SOUTHERN INDUSTRIES, INC., The Kansas City Southern Railway Co., and Louisiana & Arkansas Railway Co., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION, and United States of America, Respondents.**

**Nos. 88–4626, 88–4706.**

United States Court of Appeals, Fifth Circuit.

June 7, 1990.

Robert K. Dreiling, Kansas City, Mo., Michael A. Patterson, Long Law Firm, Baton Rouge, La., Morris Raker, Sullivan & Worcester, Boston, Mass., for petitioners.

John P. Fonte, Catherine G. O'Sullivan, Richard Thornburgh, Atty. Gen., Dept. of Justice, Washington, D.C., for the U.S.

Laurence H. Schecker, Robert S. Burk, Gen. Counsel, I.C.C., Washington, D.C., for the I.C.C.

Before JOHNSON, WILLIAMS and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Pursuant to 28 U.S.C. §§ 2321(a), 2341(3)(A), and 2344, petitioners Kansas City Southern and its affiliates (Kansas City Southern) seek review of the approval of the merger application of Rio Grande Industries, Inc. and its affiliates (Rio Grande) and related decisions by respondent the Interstate Commerce Commission (ICC). Kansas City Southern claims that the ICC erred by failing to conform to various statutory mandates for evaluating railroad consolidations, to support its factual findings with substantial evidence, to join as applicants others allegedly controlling the merging railroads, and to impose appropriate financial conditions on the merger. Intervenor-petitioner the Interna-

tional Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Union) claims that the ICC erred by failing to impose conditions on the merger protecting employees of the motor carrier subsidiaries of one of the merging railroads. For the reasons stated below, we affirm the ICC's decision.

## Facts and Proceedings Below

The present case has its roots in an earlier attempt by Santa Fe Southern Pacific Corporation (Santa Fe) to acquire Southern Pacific Transportation Company and its affiliates (Southern Pacific). In late 1983, Santa Fe and Southern Pacific agreed to consolidate their operations. Pending requisite approval of this transaction by the ICC, pursuant to 49 U.S.C. §§ 11343, 11344, Santa Fe placed Southern Pacific's stock in an independent voting trust. The ICC, however, subsequently denied Santa Fe's application because the merger would have anticompetitive consequences and ordered Santa Fe to divest either its wholly owned rail carrier subsidiary or Southern Pacific. *See Santa Fe S. Pac. Corp.— Control—SPT Co.*, 2 I.C.C.2d 709 (1986); *see also Santa Fe S. Pac. Corp.—Control —SPT Co.*, 3 I.C.C.2d 926 (1987) (declining to reconsider Santa Fe's merger application and further delineating the divestiture process).

In late 1987, Santa Fe contracted to sell Southern Pacific to a subsidiary of Rio Grande, which subsequently filed a merger application with the ICC. Shortly thereafter, Kansas City Southern filed an inconsistent application to merge with Southern Pacific. A number of significant interlocutory rulings preceded the ICC's resolution of these competing applications.

First, Kansas City Southern filed a petition requesting that the ICC join Philip F. Anschutz (Anschutz) and the company that he controls—The Anschutz Corporation (TAC)—(collectively referred to as the Anschutz Parties) as co-applicants with Rio Grande. At that time, TAC wholly owned Rio Grande and, following Rio Grande's acquisition of Southern Pacific, would control seventy-five percent of Rio Grande's

common stock. *See Rio Grande Indus.— Control—S. Pac. Transp. Co.*, Finance Docket No. 10, slip op. at 1 (served May 11, 1988). The ICC found that, with TAC as Rio Grande's majority shareholder, the Anschutz Parties undoubtedly would have the power to "control" the merged railroads. *See id.* at 2 (citing 49 U.S.C. § 11343(a)(5)). Concluding, *inter alia*, that the Anschutz Parties were not "contributing any funds to the acquisition or the future operations of the combined system," *id.* at 3, and that Rio Grande would provide all information relevant for a public interest determination, the ICC exempted the Anschutz Parties from joinder. *See id.* at 3–5 (citing 49 U.S.C. § 10505(a)). The ICC, however, noted that the Anschutz Parties would be subject to all appropriate discovery, except as to the unnecessary discovery of their finances. *See id.* at 4.

Second, the Morgan Stanley Group, Inc. and its affiliates (Morgan Stanley) filed a petition with the ICC seeking a declaratory order that they would not control Rio Grande if it acquired Southern Pacific. *See Declaratory Order—Control—Rio Grande Indus.*, Finance Docket No. 31243, slip op. at 1 (served Aug. 25, 1988). Under Rio Grande's operating plan, an affiliate of the Morgan Stanley Group, Inc.—Morgan Stanley Leveraged Equity Fund II. L.P.— would partially finance Rio Grande's acquisition of Southern Pacific in return for twenty-five percent of Rio Grande's common stock, of which five percent would be made available for sale to buyers of Rio Grande's preferred stock. Morgan Stanley also would have the following limited rights to protect its investment: (1) a supermajority (eighty percent) provision for certain extraordinary transactions, such as dissolution; (2) the power to place one director on Rio Grande's nine-member board of directors; (3) a "standstill" provision ensuring that Rio Grande maintained the status quo prior to consummation of the merger; and (4) a "put/call" provision relating to a buy out by Rio Grande of the twenty-five percent of common stock owned by Morgan Stanley and the preferred shareholders. *See id.* at 3–4. The ICC held that, as a minority shareholder

with limited protective rights, Morgan Stanley would not have the day-to-day supervision or other sufficient power over the merged railroads so as to possess control. *See id.* at 4–5. Kansas City Southern argued that, by acting in concert with Rio Grande to acquire Southern Pacific, Morgan Stanley was in control. The ICC, however, refused to extend its jurisdiction by holding that financiers of railroad mergers were necessarily in control of the resulting entity. *See id.* (discussing 49 U.S.C. § 11343(b)(3)).

Reviewing the merger applications in light of public interest considerations, *see* 49 U.S.C. §§ 11344(b)(1), 11344(c); 49 C.F.R. § 1180.1, the ICC ultimately approved Rio Grande's application and denied that of Kansas City Southern. *See Rio Grande Indus.—Control—S. Pac. Transp. Co.,* —— I.C.C.2d ——, Finance Docket No. 32000, at 3 (served Sept. 12, 1988). In approving Rio Grande's application, the ICC emphasized that the merger would create a more efficient single-line railroad and greater competition in a number of western states referred to as "the Central Corridor." *See id.* at 3, 34, 47. Although the ICC acknowledged that Kansas City Southern persuasively argued that Rio Grande overestimated the benefits resulting from a Rio Grande–Southern Pacific merger, especially with respect to that derived from locomotive maintenance and internal reroutes, Kansas City Southern conceded that the merger, at a minimum, would produce approximately $21 million quantifiable public benefits. *See id.* at 39, 55–59. Moreover, the ICC noted that this figure does not account for the unquantifiable benefits of a new single-line alternative for shippers in the Central Corridor. *See id.* at 39 n. 41. Thus, even accepting Kansas City Southern's criticisms as true, the ICC found that the public benefits clearly outweigh any minimal anticompetitive effects. *See id.* at 39–40 (applying public benefits analysis, pursuant to 49 C.F.R. § 1180.1(c)).

Kansas City Southern criticized Rio Grande's application as not assuring Southern Pacific's long-term viability. More specifically, Kansas City Southern claimed that Rio Grande's *pro forma* financial statements overestimated its future revenues and underestimated its capital expenses. The ICC, however, disagreed with a number of Kansas City Southern's adjustments of Rio Grande's projections and with Kansas City Southern's "assumption that only impacts upon [Southern Pacific] can be considered." *Id.* at 83; *see id.* app. B. Although determining that Kansas City Southern's "worst case" and the ICC's "intermediate" case scenarios would result in Southern Pacific's technical default in the fixed charge coverage ratios as computed under and required by its loan agreement with Security Pacific National Bank, the ICC found that Southern Pacific had a number of options for avoiding such a result. *See id.* at 84–85. Moreover, even under the four-year projections of the "worst case" scenario, the ICC found that the merger would satisfy the ICC's own standard fixed charge coverage requirements. *See id.* at 84–85. The ICC refused to consider any other speculative long-term projections, noting that such a finding is not a statutory requisite. *See id.* at 85. Although acknowledging that neither Rio Grande nor Southern Pacific were financially strong and their combination would be highly leveraged initially, *see id.* at 82, the ICC found not only that their merger would create a stronger entity than that of either railroad separately, but also that Southern Pacific likely would have greater long-term stability under Rio Grande's control than under its present trusteeship. *See id.* at 86.

Kansas City Southern and a number of other parties requested that the ICC impose financial restrictions, including a requirement that Rio Grande make capital expenditures of $1.75 billion over five years to ensure Southern Pacific's future viability. Because it concluded that such conditions may reduce the public and private benefits of a railroad merger, the ICC declined to impose such conditions and emphasized its presumption against imposition unless certain criteria are met, principally relating to the amelioration of possible aspects of the consolidation that would be harmful to the public interest, *see id.* at 17

(discussing the criteria set out in *Union Pac.—Control—Mo. Pac.*, 366 I.C.C. 459, 562–565 (1982)), or where there would otherwise be harm to a rail carrier's ability to provide essential services, *see id.* (discussing the criteria codified at 49 C.F.R. § 1180.1(d)). Inferentially finding that these standards were not met here, the ICC emphasized that the requested financial conditions might actually adversely affect Southern Pacific's future viability by preventing management from using its discretion as to its capital needs. *See id.* at 86.

The Union requested that the ICC impose protective labor conditions for Southern Pacific's motor carrier subsidiaries—Pacific Motor Trucking Company (Trucking) and Pacific Motor Transport Company (Transport).[1] Concluding that it was not required to impose such protections for employees of these motor carrier subsidiaries, the ICC stated,

"The statute, formerly section 5(2) of the Interstate Commerce Act, required only that the interests of *railroad* employees be protected. The 1978 recodification of the Act, while eliminating the specific reference to railroad employees, 49 U.S.C. [§] 11347, may not be read to change substantively the law it replaced, Pub.L. No. 95–473, § 3(a), 92 Stat. 1337, 1466 (1978)." *Id.* at 97 (emphasis in original).

The ICC also refused to impose such conditions on a discretionary basis, pursuant to 49 U.S.C. § 11344(c). The ICC emphasized that Rio Grande asserted that it did not plan any changes in any of the motor carriers' operations and there was no evidence that any of their employees would lose their jobs because of the merger. *See id.* at 91–92, 97.

Finally, the ICC rejected Kansas City Southern's inconsistent merger application as not being in the public interest. The ICC emphasized the need for immediate removal of Southern Pacific from its trusteeship and the unlikelihood of Kansas City

Southern's being able to do so in light of the pervasive uncertainties plaguing it. *See id.* at 3. For example, at that time, Kansas City Southern, unlike Rio Grande, did not have a contract with Santa Fe. And it had been ordered by a district court to cease all efforts to acquire Southern Pacific pending appeal of an over $800 million judgment against Kansas City Southern, which many months after the appeals herein were taken was reversed by the Eighth Circuit. *See State v. Kansas City S. Indus.*, 880 F.2d 40 (8th Cir.1989), *cert. denied,* —— U.S. —— 110 S.Ct. 726, 107 L.Ed.2d 745 (1990). The ICC also noted that Kansas City Southern's application, unlike that of Rio Grande, did not focus on enhancing competition in the Central Corridor. *See Rio Grande Indus.*, Finance Docket No. 32000, slip op. at 3, 100–02.

The ICC served its decision approving the merger application of Rio Grande and rejecting that of Kansas City Southern on September 12, 1988. On September 22, 1988, Kansas City Southern filed with this Court its petition for review of the ICC's approval of Rio Grande's application. *See* 28 U.S.C. §§ 2341(3)(A) and 2344; *see also* 28 U.S.C. § 2321(a). On October 19, 1988, the Union filed its motion for leave to intervene, challenging the ICC's refusal to impose protective labor conditions for Southern Pacific's motor carrier subsidiaries. Shortly thereafter, this Court granted the Union leave to intervene.

### Discussion

*Kansas City Southern standing*

 The threshold question presented in this case is whether Kansas City Southern has the standing necessary to petition for review of the ICC's approval of Rio Grande's application to merge with Southern Pacific. The government contends that, although Kansas City Southern was a party to the ICC proceedings below, it is not "aggrieved" by the ICC's approval of

---

1. Originally, Rio Grande also sought indirect control over a third motor carrier subsidiary of Southern Pacific—Pacific Motor Trucking Company of the Southwest, Inc. (Southwest). Southern Pacific, however, sold all of Southwest's

stock in April 1988; therefore, Southern Pacific no longer controlled Southwest at the time the ICC ruled on Rio Grande's application, and Southwest was thus not involved in the merger. *See id.* at 91 n. 87.

the Rio Grande–Southern Pacific merger and, therefore, lacks standing to appeal that order, pursuant to 28 U.S.C. § 2344. To determine whether a petitioner is aggrieved under section 2344, we generally incorporate traditional article III and prudential standing analysis. *See, e.g., Panhandle Producers & Royalty Owners Ass'n v. Economic Regulatory Admin.,* 847 F.2d 1168, 1173 (5th Cir.1988). Thus, Kansas City Southern must allege that it suffered (1) a personal injury (2) fairly traceable to the ICC's order and (3) likely to be redressed by Kansas City Southern's request for reversal and remand of that order with directions for the ICC to divest Southern Pacific from Rio Grande. *See Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

To have standing, Kansas City Southern must have suffered a "distinct and palpable" personal injury. *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). In other words, it must allege more than that it suffered a theoretical or abstract injury from the ICC's allegedly having acted contrary to statutory mandates in approving Rio Grande's merger application. *See Allen,* 104 S.Ct. at 3326.

■ In its reply brief on appeal, Kansas City Southern alleges that the ICC's unlawful denial of its merger application caused it to have lost the opportunity to acquire Southern Pacific. Although such an allegation likely satisfies the personal injury requirement, *see, e.g., Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel,* 792 F.2d 1172, 1178 (D.C.Cir.1986), Kansas City Southern waived its right to appeal the denial of its merger application by not raising any complaint of that ruling in its opening brief. *See Light v. Blue Cross & Blue Shield of Ala., Inc.,* 790 F.2d 1247, 1248 n. 2 (5th Cir.1986) (citation omitted). At oral argument on appeal, counsel for Kansas City Southern conceded the failure to preserve its right to appeal the ICC's denial of Kansas City Southern's application.

■ Kansas City Southern also contends that because of the Rio Grande–Southern Pacific merger it will suffer an economic injury apart from its lost opportunity to itself acquire Southern Pacific. According to Rio Grande's operation plan for consolidation with Southern Pacific, Rio Grande will discontinue use of a terminal in Kansas City, Kansas (the Knoche Yard), which is partially owned by Kansas City Southern, and will move to another terminal there (the Armourdale Yard), which is owned by Southern Pacific. According to the verified statement of Otis C. Burge (Burge)—an officer of Kansas City Southern—which was presented to the ICC below, such a move by Rio Grande would cause the other railroads in Kansas City, such as Kansas City Southern, to incur new or additional trackage use costs and corresponding delays reducing productivity. Burge also states that in 1986 Rio Grande paid $3,971,-595.80 for using the Knoche Yard. Although Kansas City Southern presented Burge's statement principally to show that Rio Grande overestimated any savings resulting from its prospective move to the Armourdale Yard, this move obviously will deprive Kansas City Southern of its portion of the revenues it would have otherwise received from Rio Grande for Rio Grande's use of the Knoche Yard and may well cause it various increased costs. These allegations of an economic injury resulting from the ICC's approval of Rio Grande's merger application satisfy the personal injury requirement.

Although the causation and redressibility requirements tend to overlap, causation concerns the injury's relationship with the allegedly unlawful conduct, whereas redressibility concerns that with the requested relief. *See Allen,* 104 S.Ct. at 3325 n. 19. Kansas City Southern's allegation of revenue loss and increased costs resulting from Rio Grande's discontinued use of Kansas City Southern's terminal because of the merger constitutes a " 'direct' relationship between the alleged injury and the claim sought to be adjudicated." *Linda R.S. v. Richard D.,* 410 U.S. 614, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973). Moreover, reversal of the ICC's approval of Rio Grande's merger application with instructions for the ICC to order Rio Grande to

divest Southern Pacific would redress this alleged economic injury.[2]

■■■ Thus, Kansas City Southern has alleged sufficiently that it is an aggrieved party with personal standing to challenge the ICC's approval of the Rio Grande–Southern Pacific merger, "accept[ing] as true all material allegations of the [petition]." *Warth,* 95 S.Ct. at 2206–07. Having established personal standing, Kansas City Southern may argue in the public interest that the ICC did not comply with statutory mandates in approving Rio Grande's application. *See Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972).[3]

*Kansas City Southern's merits arguments*

Kansas City Southern contends that the ICC did not conform to applicable statutory mandates in approving Rio Grande's merger application. Kansas City Southern primarily attacks the ICC's refusal to consider the long-term financial viability of Southern Pacific as an erroneous ruling of law.

In reviewing agency actions, we "shall decide all relevant questions of law, [and] interpret ... statutory provisions." 5 U.S.C. § 706. In *Chevron, U.S.A., Inc. v.*

*Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the United States Supreme Court further explained that "the judiciary ... must reject administrative [statutory] constructions which are contrary to clear congressional intent." *Id.* 104 S.Ct. at 2781 n. 9. On the other hand, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 2782 (footnote omitted). In other words:

" 'This view of the agency charged with administering the statute is entitled to great deference; and to sustain it, we need not find that it is the only permissible construction that [the agency] might have adopted but only that [the agency's] understanding of [the statute] is a sufficiently rational one to preclude a court from substituting its judgment for that of [the agency].' " *Fleetwood Enters. v. HUD,* 818 F.2d 1188, 1194 (5th Cir.1987) (quoting *Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc.,* 470 U.S. 116, 105 S.Ct. 1102, 1108, 84 L.Ed.2d 90 (1985)).

In evaluating Rio Grande's merger application, the ICC determined that "[t]he stat-

---

**2.** Kansas City Southern also alleges that it has an economic stake in the financial well-being of Southern Pacific—*i.e.,* if Southern Pacific goes bankrupt because of its merger with Rio Grande, Kansas City Southern likely will no longer be able to share certain lines with Southern Pacific and may not be able to recover its portion of the service charges collected by Southern Pacific on those lines. *See In re Iowa R.R.,* 840 F.2d 535, 545 (7th Cir.) (railway has only an unsecured debt in interline charges collected by bankrupt railway), *cert. denied,* —— U.S. ——, 109 S.Ct. 244, 102 L.Ed.2d 233 (1988). Kansas City Southern, however, apparently never presented such evidence concerning the potential loss of interline services and charges to the ICC. Even if such evidence were presented, its sufficiency to meet the causation and redressibility prongs might be questionable. The ICC's approval of Rio Grande's merger application may potentially cause Kansas City Southern's loss of such interline services and charges only to the extent that the Rio Grande–Southern Pacific merger may result in Southern Pacific's bankruptcy. Even assuming that the merger will cause Southern Pacific's bankruptcy, it is not clear whether Southern Pacific would avoid

bankruptcy if we reversed the ICC's approval of the Rio Grande–Southern Pacific merger in light of Southern Pacific's apparent financial straits under its present trusteeship. *See America W. Airlines v. Burnley,* 838 F.2d 1343, 1345 (D.C.Cir. 1988) (per curiam) (no redressibility where divestiture of airlines' merger would not make plaintiff better off).

**3.** Kansas City Southern also must meet the prudential standing requirement that the interest it seeks to vindicate be arguably within the zone of interests protected by the statutory guarantees in question. *See Clarke v. Securities Indus.,* 479 U.S. 388, 107 S.Ct. 750, 755–57, 93 L.Ed.2d 757 (1987); *Panhandle Producers & Royalty Owners Ass'n,* 847 F.2d at 1173. "The essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.' " *Id.* 107 S.Ct. at 757 (quoting *Block v. Community Nutrition Inst.,* 467 U.S. 340, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984) (citation omitted). We hold that Kansas City Southern also satisfies this "not ... especially demanding" prudential requirement. *Clarke* 107 S.Ct. at 757.

ute does not require us to make a finding of long-term financial viability and any long-term quantitative projections would be highly speculative and of little value." *Rio Grande Indus.*, Finance Docket No. 32000, slip op. at 85. In fact, the ICC considered the projections of Rio Grande and Kansas City Southern concerning Southern Pacific's financial viability within the four years following the merger. Although determining that, under Kansas City Southern's "worst case" and the ICC's "intermediate" case scenarios, Southern Pacific would be in technical default respecting the fixed charge coverage ratios computed under and required by its loan agreement with Security Pacific National Bank within two to four years, the ICC also found that Southern Pacific would nevertheless have a number of options to avoid such a default. More importantly, the ICC found that, even under the "worst case" scenario, Southern Pacific would satisfy the ICC's own standard fixed charge coverage requirements implementing 49 U.S.C. § 11344(b)(1)(C).

▮▮▮▮ Congress requires the ICC to consider the "public interest" in evaluating

such a merger. *See* 49 U.S.C. §§ 11344(b)(1), 11344(c); 49 C.F.R. § 1180.1.[4] Although requiring, for example, that the ICC "consider," among other things, "the total fixed charges that result from the proposed transaction," 49 U.S.C. § 11344(b)(1)(C), as did the ICC in this case, Congress did not mandate that the ICC must consider a merging railroad's long-term financial viability. Indeed, at some point, such a consideration becomes quite speculative. *See Missouri–Kansas–Texas R.R. v. United States*, 632 F.2d 392, 406 (5th Cir.1980) ("the future is not subject to proof"), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3004 *and* 101 S.Ct. 3005, 69 L.Ed.2d 388 (1981). Where, as here, the ICC has found on adequate evidence that the merger is calculated to make each party to it stronger than it would be on a stand-alone basis, and there is no compelling demonstration of an available alternative that will ensure long-term financial viability, the ICC's failure to determine the long-term financial viability of the merged entity is permissible.[5] Because the ICC's legal de-

4. Section 11344(b)(1), 49 U.S.C., provides:

"(b)(1) In a proceeding under this section *which involves the merger or control of at least two class I railroads,* as defined by the Commission, the Commission shall consider at least the following:

"(A) the effect of the proposed transaction on the adequacy of transportation to the public,

"(B) the effect on the *public interest of including,* or failing to include, other rail carriers in the area involved in the proposed transaction,

"(C) the total fixed charges that result from the proposed transaction,

"(D) the interest of carrier employees affected by the proposed transaction,

"(E) whether the proposed transaction would have an adverse effect on competition among rail carriers in the affected region." Section 11344(c), 49 U.S.C., provides:

"(c) The Commission shall approve and authorize a transaction under this section when it finds the transaction is consistent with the public interest. The Commission may impose conditions governing the transaction. When the transaction contemplates a guaranty or assumption of payment of dividends or of fixed charges or will result in an increase of total fixed charges, the Commission may approve and authorize the transaction only if it finds that the guaranty assumption, or in-

crease is consistent with the public interest. When a rail carrier, or a person controlled by or affiliated with a rail carrier, is an applicant and the transaction involves a motor carrier, the Commission may approve and authorize the transaction only if it finds that the transaction is consistent with the public interest, will enable the rail carrier to use motor carrier transportation to public advantage in its operations, and will not unreasonably restrain competition. When a rail carrier is involved in the transaction, the Commission may require inclusion of other rail carriers located in the area involved in the transaction if they apply for inclusion and the Commission finds their inclusion to be consistent with the public interest."

5. Kansas City Southern also contends that the ICC erroneously considered only the combined effect of the merger but not its effect on Southern Pacific. *See Rio Grande Indus.,* Finance Docket No. 32000, slip op. at 83 (served Sept. 12, 1988) ("We disagree with the assumption that only impact upon [Southern Pacific] can be considered."). Kansas City Southern, however, simply is misinterpreting this statement. Not only did the ICC actually say that it must consider more than the effect on Southern Pacific alone—*i.e.,* it must consider both the impact on the merging railroads together and separately, *see id.*—the ICC made such an examination be-

terminations with respect to long-term financial viability are not contrary to a clear congressional mandate, we defer to the ICC's sufficiently rational statutory interpretation.

Attacking Rio Grande's future revenue and capital expense projections before the ICC below, Kansas City Southern also challenges the findings of fact supporting the ICC's approval of Rio Grande's application as being in the public interest. Pursuant to 5 U.S.C. § 706(2)(E), a reviewing court must set aside those agency findings "found to be ... unsupported by substantial evidence." Under the "substantial evidence" test, a reviewing court "will not displace the agency's [factual findings] so long as a reasonable person could reach that conclusion." *National Grain & Feed Ass'n v. OSHA*, 866 F.2d 717, 728 (5th Cir.1988).

■■■ Essentially, Kansas City Southern is asking this Court to reweigh the evidence presented to the ICC. We refuse that invitation. *See Missouri–Kansas–Texas R.R.*, 632 F.2d at 399–400; *see also Southern Pac. Transp. Co. v. ICC*, 736 F.2d 708, 720 (D.C.Cir.1984) (declining Kansas City Southern's invitation to duplicate the ICC's calculation of public benefits in another consolidation case), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1171 *and* 105 S.Ct. 1172, 84 L.Ed.2d 322 (1985). The ICC carefully considered Kansas City Southern's criticisms of Rio Grande's *pro forma* financial statements, as well as Rio Grande's rebuttal of Kansas City Southern's criti-

cisms. Even accepting Kansas City Southern's criticisms as true, the ICC found that a Rio Grande–Southern Pacific merger would satisfy ICC standard fixed charge coverage requirements and result in $21 million quantifiable public benefits, as well as the unquantifiable benefits of increased competition in the Central Corridor. Moreover, the ICC concluded that both of the merging railroads would be economically stronger because of the merger. We find the ICC's approval of Rio Grande's application to be supported by substantial evidence.

■■■ Kansas City Southern also contends, without much explanation, that the ICC's refusal to impose financial conditions ensuring that resources were committed to Southern Pacific's future viability is unreasonable. The imposition of such conditions, however, is within the ICC's discretion and should be given great deference, *see Southern Pac. Transp. Co.*, 736 F.2d at 720–21 (citing, *e.g., Seaboard Coast Line R.R. v. United States*, 599 F.2d 650, 652 (5th Cir.1979)). Moreover, the ICC does not normally impose such conditions unless certain criteria are met. *See Rio Grande Indus.*, Finance Docket No. 32000, slip op. at 17 (citing *Union Pacific*, 366 I.C.C. at 562–65 [delineating criteria for imposing conditions to remedy anticompetitive effects]; 49 C.F.R. § 1180.1(d)(1) (1988) [codifying criteria for imposing conditions to remedy harm to a rail carrier's ability to provide essential services]).[6] Refusing to

---

low. Concluding its analysis as to fixed charges and financial viability, the ICC stated, "We are convinced that a [Rio Grande–Southern Pacific] combination will result in a *stronger* entity *than the two carriers separately, and* that [*Southern Pacific*] *will have a better chance* for long-term stability under [Rio Grande] control *than as a stand-alone* railroad." *Id.* at 86 (emphasis added).

**6.** The ICC stated here:
"Under 49 U.S.C. 11344(c), we have broad authority to impose conditions governing railroad consolidations. However, the Commission recognizes that conditions may reduce the benefits of a consolidation to the carriers and the public. Therefore, the Commission will not normally impose conditions unless certain criteria are met.

"Criteria for imposing conditions to remedy anticompetitive effects are uncodified but were set out in our *UP/WP/MP* decision, 366 I.C.C. at 562–565. There, we stated that we will not impose public interest conditions on a railroad consolidation unless we find that the consolidation may produce effects harmful to the public interest (such as a significant reduction of competition in an affected market), that the conditions to be imposed will ameliorate or eliminate the harmful effects, that the conditions will be operationally feasible, and that the conditions will produce public benefits (through reduction or elimination of the possible harm) outweighing any reduction to the public benefits produced by the merger. We are also disinclined to impose conditions that would broadly restructure the competitive balance among railroads

impose conditions, such as a minimal level of capital expenditures, the ICC emphasized that such conditions would prevent Rio Grande's management from using its discretion to choose the appropriate amount of and time for capital expenditures. The ICC determined that, by invading management discretion, the imposition of financial conditions might even harm Southern Pacific's future viability. We conclude that the ICC did not abuse its discretion by refusing to impose financial conditions.

*Failure to join Anschutz Parties and Morgan Stanley*

Kansas City Southern also contends that the ICC erred in refusing to require joinder of the Anschutz Parties, sole owners of Rio Grande prior to the merger and majority shareholders after its consummation, and Morgan Stanley, a financier of the merger and minority shareholder after its consummation, as co-applicants with Rio Grande. Kansas City Southern emphasizes that such equity owners and financiers would control the merged railroads. *See* 49 U.S.C. § 10102(7) (defining "control" to include "actual control, legal control, and the power to exercise control through or by ... any ... means"); *id.* § 11343(b)(3) ("A [merger involving] at least 2 persons acting together (one of whom is a carrier or is affiliated with a carrier) has the effect of

putting those persons ..., taken together, in control of another carrier.").

[14] Reviewing courts generally defer to the ICC's fact-intensive decision as to whether control exists. *See Gilbertsville Trucking Co. v. United States,* 371 U.S. 115, 83 S.Ct. 217, 223–24, 9 L.Ed.2d 177 (1962). The ICC determined that to hold that Morgan Stanley, as a financier of the merger, was in control of the merging railroads, pursuant to section 11343(b)(3), unjustifiably would expand the ICC's jurisdiction. *See Gilbertsville,* 83 S.Ct. at 224 (the ICC "may adapt" the statutory definition of control "to the actualities and current practices of the industry involved and apply it to the extent it feels necessary to protect its jurisdiction"). The ICC also found that Morgan Stanley, as a minority shareholder with only limited protective powers, would not retain the kind of supervision or powers necessary to be in control of the merged railroads. We conclude that the ICC's decision not to join Morgan Stanley was not an abuse of discretion and is supported by substantial evidence. *See* 5 U.S.C. § 706(2).

[15] Although the Anschutz Parties undoubtedly would be in control with TAC as Rio Grande's majority shareholder, the ICC justifiably used its discretion in exempting them as joint applicants, pursuant to 49 U.S.C. § 10505(a),[7] because the ICC had all

with unpredictable effects. *SFSP,* 2 I.C.C.2d at 827.

"We also consider imposing conditions where a consolidation would harm a rail carrier's ability to provide essential services. These criteria are codified at 49 C.F.R. 1180.-1(d). A condition: (1) must be shown to be related to the impact of the consolidation; (2) must be designed to enable shippers to receive adequate service; (3) must not pose unreasonable operating or other problems for the consolidated carrier; and (4) must not frustrate the ability of the consolidated carrier to obtain the anticipated public benefits." *Rio Grande Indus.,* Finance Docket No. 32000, slip op. at 17.

Section 1180.1(d)(1), 49 C.F.R., (1988) provides: "*(d) Conditions.* (1) The Commission has broad authority to impose conditions on consolidations, including those that might be useful in ameliorating potential anticompetitive effects of a consolidation. However, the Commission recognizes that conditions may

lessen the benefits of a consolidation to both the carrier and the public. Therefore, the Commission will not normally impose conditions on a consolidation to protect a carrier unless essential services are affected and the condition: (i) Is shown to be related to the impact of the consolidation; (ii) is designed to enable shippers to receive adequate service; (iii) would not pose unreasonable operating or other problems for the consolidated carrier; and (iv) would not frustrate the ability of the consolidated carrier to obtain the anticipated public benefits. Moreover, the Commission believes that indemnification is ordinarily not an appropriate remedy in consolidation proceedings. Indemnification conditions can be anticompetitive by requiring the consolidated carrier to subsidize carriers who are no longer able to compete efficiently in the marketplace."

7. Section 10505(a), 49 U.S.C., provides: "**(a)** In a matter related to a rail carrier providing transportation subject to the juris-

the information necessary to make its public interest determination. *Cf. Lamoille Valley R.R. v. ICC,* 711 F.2d 295, 324–26 (D.C.Cir.1983). The ICC properly found that the finances of Anschutz would not be involved in Rio Grande's acquisition of Southern Pacific or the merged railroads' operations and, therefore, the ICC could reasonably determine that they were not significantly relevant to the ICC's consideration of Rio Grande's application. Moreover, the ICC allowed Kansas City Southern to conduct discovery of Anschutz for other information that was relevant to the ICC's decision. Thus, we are unable to conclude that the ICC abused its discretion in refusing to join Morgan Stanley and the Anschutz Parties as co-applicants with Rio Grande.[8]

Accordingly, though we have jurisdiction of its appeal, we reject Kansas City Southern's attacks on the ICC's order.

*Union appeal; jurisdiction*

The Union on its appeal contends that the ICC erred in refusing to impose mandatory labor protective conditions for the motor carrier subsidiaries of Southern Pacific. The threshold question with respect to the Union's appeal is whether this Court has jurisdiction over the petition by the Union, an intervenor, which appeals an issue with respect to the ICC order completely unrelated to that earlier appealed by Kansas City Southern.

To seek direct review of an ICC order by a federal appeals court, a petitioner must file a petition for review within sixty days of the agency action in question. *See* 28 U.S.C. § 2344.[9] Moreover, a party may intervene in such an appeal by filing a motion within thirty days of the date on which the petition for review is filed. *See* Fed.R.App.P. 15(d).[10] In the present case, the ICC served its decision approving Rio Grande's application but refusing to impose labor conditions respecting Southern Pacific's motor carrier subsidiaries on September 12, 1988. Kansas City Southern filed in this Court its petition appealing the ICC order on September 22, 1988. On October 19, 1988, within sixty days of the ICC's challenged September 12, 1988 order and thirty days of Kansas City Southern's September 22, 1988 petition for review, the Union filed in this Court its motion for leave to intervene, which we subsequently granted. *See* 28 U.S.C. §§ 2323, 2348.

Intervenor-respondent Santa Fe relies primarily on *United Gas Pipe Line v. FERC,* 824 F.2d 417, 435–36 (5th Cir.1987), for the proposition that federal courts of appeals do not have jurisdiction to review an intervenor's challenge to an aspect of an agency ruling wholly unrelated to that appealed by the petitioner for direct review. *See id.* at 435–36. In *United Gas,* an intervenor in a proceeding to review certain

---

diction of the Interstate Commerce Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—

"(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

"(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power."

**8.** Kansas City Southern has waived an issue, concerning whether the ICC acted properly in permitting Santa Fe to administer Southern Pacific's divestiture, which was mentioned in Kansas City Southern's opening brief but was never discussed therein. *See, e.g., Harris v. Plastic Mfg. Co.,* 617 F.2d 438, 440 (5th Cir.1980).

**9.** Section 2344 provides in part that "[a]ny party aggrieved by the final [agency] order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies."

**10.** Fed.R.App.P. 15(d), dealing with direct appeals from administrative agencies, provides:

"(d) **Intervention.** Unless an applicable statute provides a different method of intervention, a person who desires to intervene in a proceeding under this rule shall serve upon all parties to the proceeding and file with the clerk of the court of appeals a motion for leave to intervene. The motion shall contain a concise statement of the interest of the moving party and the grounds upon which intervention is sought. A motion for leave to intervene or other notice of intervention authorized by an applicable statute shall be filed within 30 days of the date on which the petition for review is filed."

Federal Energy Regulatory Commission (FERC) actions raised issues that had not been raised by those who filed petitions for review. *See id.* at 434–38. This Court held that "we do not have jurisdiction to consider intervenors' issues that are in addition to those raised in petitions for review." *Id.* at 435. Section 19 of the Natural Gas Act delineates the judicial requisites for review of a FERC order. Any party aggrieved by a FERC order must file an application with FERC for rehearing. If that application is unsuccessful, the party may seek review in a court of appeals by filing a petition within sixty days of the FERC order disposing of the party's rehearing application. *See* 15 U.S.C. § 717r(a)–(b).[11] The intervenors in *United Gas* filed their motion for leave to intervene *after* section 19's sixty-day filing requirement, but before Rule 15(d)'s thirty-day filing requirement, had run. *See United Gas,* 824 F.2d at 434–36. The Court in *United Gas* emphasized that, "[i]f we permit an intervenor to raise additional issues for review, we contravene the sixty-day filing limit in section 19 by permitting filings as late as 90 days after the order on rehearing to seek modification or setting aside of the Commission's orders." *Id.* at 436.

 In the present case, the Union, which had appeared before the ICC in the proceedings below as a party in interest therein, filed its motion for leave to intervene in the proceedings in this Court not only within Rule 15(d)'s thirty-day filing requirement for intervention motions but also within section 2344's sixty-day filing requirement for petitions for review of ICC orders. The Union's motion to intervene indicates that the Union's interest is in challenging the ICC's denial, in its September 12, 1988 order, of the Union's previously filed request for the imposition of labor protective provisions. Thus, unlike the intervenors in *United Gas,* the Union has not contravened the sixty-day filing requirement by thereafter raising an issue for review in addition to those raised by Kansas City Southern, and we find that this Court has jurisdiction to review that issue.

### Union appeal; merits

The Union contests the ICC's refusal to impose mandatory labor protection for motor carrier subsidiaries of Southern Pacific, pursuant to 49 U.S.C. § 11347 (formerly section 5(2)(f)).[12] The ICC held that the requirement for such mandatory conditions was inapplicable because these employees were not affected railroad employees. Former section 5(2)(f) provided that, as a condition of its approval of certain transactions involving rail carriers, the ICC "shall require a fair and equitable arrangement to protect the interests of the railroad employees affected."[13] The ICC has interpreted this section to mandate protective labor conditions for only railroad employees— *i.e.,* those who work for a railroad or a rail carrier subsidiary. *See Walters v. Roadway Express, Inc.,* 557 F.2d 521, 523 n. 2 (5th Cir.1977) (involving a merger between

---

11. By contrast, 28 U.S.C. § 2344 does not require filing a motion for rehearing with the agency before seeking judicial review.

12. The Union does not challenge the ICC's refusal to impose such protective conditions on a discretionary basis, pursuant to 49 U.S.C. § 11344(c).

13. Former section 5(2)(f) provided:
 "As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order

such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 11 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees."

two motor carriers and holding that former section 5(2)(f) "does not *require* the ICC to grant these protections to employees of motor carriers") (emphasis in original); note 16 and accompanying text, *infra.* In October 1978, the Interstate Commerce Act was recodified. Section 11347 replaced former section 5(2)(f) and states that the ICC "shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction." [14]

The Union emphasizes that, as revised, section 11347 mandates protective labor conditions for all affected employees of a railroad, such as the employees of Southern Pacific's motor carrier subsidiaries, not just those who are employed by a rail carrier or are doing rail-related work. As the ICC noted below, however, Congress did not intend that these slight alterations have any substantive impact. *See* Pub.L. No. 95–473, § 3(a), 92 Stat. 1337, 1466 (1978) (the provisions in question, including section 11347, "restate, without substantive change, laws enacted before May 16, 1978" and "may not be construed as making a substantive change in the laws replaced").

Notwithstanding this congressional intent, however, the Union contends that this Court can support its interpretation in the following two ways: (1) by flexibly interpreting the 1978 recodification as merely a presumption that any changes are to have no substantive impact; or (2) by interpreting the elimination of the term "railroad" in section 11347 as Congress's clarification of the proper interpretation of former section 5(2)(f). This is a question of first impression in this Court.

First, the Union cites H.R.Rep. No. 1395, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.News 3009, to emphasize that Congress's formal, statutory instruction that its 1978 recodification constitutes no substantive change is merely a presumption, *see id.* at 9, *reprinted in* U.S.Code Cong. & Admin.News at 3018; *cf. Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 101 S.Ct. 1124, 1131 n. 7, 67 L.Ed.2d 258 (1981) (*"In the main,* this recodification is without substantive change.") (emphasis added), and that the express language of section 11347 overcomes that presumption in this case.[15]

---

**14.** Section 11347 states:

"When a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or section 11346 of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of employees who are affected by the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 405 of the Rail Passenger Service Act (45 U.S.C. 565). Notwithstanding this subtitle, the arrangement may be made by the rail carrier and the authorized representative of its employees. The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission (or if an employee was employed for a lesser period of time by the carrier before the action became effective, for that lesser period)."

Even apart from the congressional intent that the 1978 recodification have no substantive impact, *see* note 15 and accompanying text, *infra,* section 11347 read as a whole can reasonably be understood to mandate protective labor conditions only for affected employees of a railroad

or a rail carrier subsidiary involved in a merger. Section 11347 speaks of rail carriers involved, for example, in a merger and the need to protect employees affected by that merger, without reference to any other type of entity, such as a motor carrier subsidiary. On two occasions, section 11347 modifies its reference to employees by the term "rail carrier." *See id.* ("[T]he arrangement may be made by the *rail carrier* and the authorized representative of *its employees.* The arrangement ... must require that *the employees of the affected rail carrier* will not be in worse position ...") (emphasis added). In light of section 11344(c), which allows the ICC to impose such protections for motor carrier employees on a discretionary basis, it is reasonable to conclude that section 11347's mandatory labor protections are limited to affected employees of a railroad or a rail carrier subsidiary involved in such a merger. According to the ICC's decision below, this distinction is also justified because of the ICC's expert judgment that "[t]ruckers generally do not have limited skills, as do rail employees, but can more easily find employment throughout the motor carrier industry." *Rio Grande Indus.*, Finance Docket No. 32000, slip op. at 97 (citation omitted).

**15.** With respect to whether substantive change was intended, the House Report cited by the Union states:

The Eighth Circuit has addressed this issue. In *Cosby v. ICC*, 741 F.2d 1077 (8th Cir.1984), *cert. denied*, 471 U.S. 1110, 105 S.Ct. 2344, 85 L.Ed.2d 861 (1985), the court stated, "If Congress meant for section 11347 to apply only to employees who worked for rail carriers and not all the employees affected by the merger, the clearest way to express this restriction would have been to leave the relevant language in section 5(2)(f) as it was." *Id.* at 1080. This statement in *Cosby*, however, is dictum, as is apparent from the sentence following the statement quoted above: "We need not resolve this question of interpretation because we believe, in the circumstances of this case, that the [motor carrier subsidiary's] employees are 'railroad employees' within the meaning of the Act." *Id.*

Second, the Union contends that the elimination of the term "railroad" as a modifier of "employees" in section 11347, viewed in light of Congress's intent that its 1978 recodification not constitute a substantive change, reflects Congress's understanding and clarification of the proper interpretation of former section 5(2)(f). *Cf. Purolator Courier Corp. v. ICC*, 598 F.2d 225, 227 n. 5 (D.C.Cir.1979) (Although "enactment of the revised Interstate Commerce Act was not intended to work any substan-

tive change in the Act ..., the new language may serve as a guide to the meaning of the original Act."). The Union argues that Congress always intended that this section—formerly 5(2)(f) and now 11347—mandate protective labor conditions for all employees of a railroad involved in a merger, including the employees of a railroad's motor carrier subsidiary, not just those employed by a rail carrier or who do rail-related work.

■ We reject these two interpretations of section 11347 and sustain that of the ICC below. As previously discussed, we generally defer to an agency's sufficiently rational interpretation of a statute it is charged to administer, unless that interpretation is contrary to clear statutory language or congressional intent. *See Fleetwood Enters.*, 818 F.2d at 1194. Here, the ICC emphasized that former section 5(2)(f) "required only that the interests of *railroad* employees be protected" and that section 3(a) of the 1978 recodification of the Interstate Commerce Act expressly states that wording changes, such as in section 11347, are not intended to have any substantive impact. *Rio Grande Indus.*, Finance Docket No. 32000, slip op. at 97 (emphasis in original). Consistent with its apparently longstanding interpretation,[16] the ICC held that "employees of nonrail

---

*"Substantive change not intended.*—Like other codifications undertaken to enact into positive law all titles of the United States Code, this bill makes no substantive change in the law. It is sometimes feared that mere changes in terminology and style will result in changes in substance or impair the precedent value of earlier judicial decisions and other interpretations. This fear might have some weight if this were the usual kind of amendatory legislation where it can be inferred that a change of language is intended to change substance. In a codification statute, however, the courts uphold the contrary presumption: the statute is intended to remain substantively unchanged." H.R.Rep. No. 1395, at 9, *reprinted in* U.S.Code Cong. & Admin.News at 3018. *See Illinois Central Gulf R.R. Co. v. Delta Millwork, Inc.*, 802 F.2d 156, 157 n. 2 (5th Cir.1986) ("The purpose of [the 1978 recodification] was to substitute simple language for awkward and obsolete terms. The changes were comprehensive, but were made without substantive change to the existing law." (citing H.R.Rep. No. 1395, *reprinted in* 1978 Code Cong. & Admin.News at 3013, 3016–18)).

16. The Union contends that in *Pennsylvania R.R.—Control—N.Y. Cent. R.R.*, 347 I.C.C. 536 (1974), the ICC held that former section 5(2)(f) mandated protective labor conditions for employees of common carrier subsidiaries of a railroad involved in a merger. The Union, therefore, concluded that, because the motor carrier subsidiaries involved in the present case are common carriers, the ICC must protect the subsidiaries' employees from possible adverse effects of the merger. In *Pennsylvania R.R.*, the ICC found that section 5(2)(f) mandated protective provisions for *rail carrier* subsidiaries but not for nonrail subsidiaries, such as the warehousing and railroad car leasing subsidiaries involved in that case. *See id.* at 549–50; *see also Cosby*, 741 F.2d at 1080 (discussing *Pennsylvania R.R.*). Indeed, the Union admits that no motor carrier subsidiary was involved in *Cosby*. Thus, regardless of its discussion of common carriers, *Pennsylvania R.R.* did not extend section 5(2)(f) to mandate protections for motor carrier employees.

affiliates of railroads are not required by statute to be protected from the effects of rail mergers." *Id.* In light of the modification of "employees" by the term "railroad" in former section 5(2)(f) and Congress's express statutory declaration that the 1978 recodification does not have any substantive impact, we sustain as sufficiently rational the ICC's interpretation that section 11347 does not mandate labor protective conditions for employees of motor carrier subsidiaries of a merging railroad. *But see Cosby*, 741 F.2d at 1080 (dictum).

Alternatively, the Union cites *Cosby* for the proposition that, where motor carrier subsidiaries perform a substantial amount of rail-related work, they are affected "railroad employees" under the ICC's interpretation of section 11347. In *Cosby*, terminated employees of a motor carrier subsidiary of a railroad involved in an ICC-approved merger appealed the ICC's refusal to impose protective layoff benefits for these employees. The court held that the employees of this motor carrier subsidiary were "railroad employees" and, therefore, that section 11347 mandated protective labor conditions for them. *See Cosby*, 741 F.2d at 1080. Distinguishing such cases as our decision in *Walters*, which interpreted former section 5(2)(f) as inapplicable to motor carrier employees, *see Walters*, 557 F.2d at 523 n. 2, the Eighth Circuit emphasized that the motor carrier subsidiary involved in *Cosby* had been restricted by the ICC to auxiliary-to-rail services and was "exclusively" engaged in such rail-related activities. *Cosby*, 741 F.2d at 1081.

 In the case *sub judice*, because of the ICC's approval of Rio Grande's merger application, Rio Grande indirectly acquired control of Southern Pacific's two motor carrier subsidiaries—Trucking and Transport. The Union does not suggest that

Transport engages in rail-related work. Indeed, Southern Pacific points out that *none* of Transport's 1986–87 gross revenues came from rail-related activities. According to both the Union and Southern Pacific, only twenty-two percent of Trucking's 1987 revenues came from such activities.[17] Moreover, unlike the motor carrier subsidiary involved in *Cosby*, obviously neither Transport nor Trucking were restricted by the ICC to auxiliary-to-rail services. Thus, *Cosby*'s extension of section 11347 to mandate protections for employees of motor carrier subsidiaries legally restricted to and exclusively engaged in rail-related activities does not apply to the facts of this case.[18]

## Conclusion

We hold that we have jurisdiction to consider the challenges to the ICC's order presented by Kansas City Southern and the Union, that Kansas City Southern has waived certain of its challenges, and that the remaining challenges presented by Kansas City Southern, and those presented by the Union, are without merit. Accordingly, Kansas City Southern's petition for review, and the relief requested by the Union under its intervention petition, are denied and the challenged orders of the ICC are AFFIRMED.

---

17. On the other hand, fifty-six percent of the 1987 revenues of a third Southern Pacific motor carrier subsidiary—Southwest—were derived from rail-related activities. As noted earlier, however, Southern Pacific sold Southwest prior to the ICC's approval of Rio Grande's application; therefore, Rio Grande did not directly or indirectly acquire control of Southwest by

merging with Southern Pacific. *See* note 1, *supra.*

18. Because we find that the employees of Southern Pacific's Trucking and Transport subsidiaries are not "railroad employees," it is unnecessary to address whether they were "affected" by the Rio Grande–Southern Pacific merger.