Ronald L. COSBY, et al., Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

Burlington Northern Railroad
Company, Intervenor.

No. 84–1110.

United States Court of Appeals,
Eighth Circuit.

Submitted June 15, 1984.

Decided Aug. 22, 1984.

Rehearing and Rehearing En Banc
Denied Oct. 18, 1984.

Frank W. Taylor, Alex M. Lewandowski, Ruth E. Bandoli, Kansas City, Mo., for petitioners; Griffin, Dysart, Taylor, Penner & Lay, P.C., Kansas City, Mo., of counsel.

Donald E. Engle, Nicholas P. Moros, William R. Power, St. Paul, Minn., Attys. for intervenor, Burlington Northern R. Co.

J. Paul McGrath, Asst. Atty. Gen., Barry Grossman, Frederic Freilicher, Attys., Dept. of Justice, Washington, D.C., John Broadley, Gen. Counsel, Lawrence H. Richmond, Deputy Associate Gen. Counsel, John J. McCarthy, Jr., Atty., I.C.C., Washington, D.C., for respondents.

Before HEANEY and FAGG, Circuit Judges, and COLLINSON,* Senior District Judge.

HEANEY, Circuit Judge.

Ronald L. Cosby and more than one hundred other terminated employees of the Frisco Transportation Company (FTC), a subsidiary of the St. Louis-San Francisco Railway Company (Frisco), requests this Court to review a decision of the Interstate Commerce Commission which denied them

* The Honorable WILLIAM R. COLLINSON, Senior United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

layoff benefits in accordance with employee protective conditions contained in a 1980 order approving the merger of the Burlington Northern (BN) and Frisco. 360 I.C.C. 788 (1980), *aff'd sub nom., Missouri-Kansas-Texas Railroad v. United States*, 632 F.2d 392 (5th Cir.1980), *cert. denied*, 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981). We hold that the petitioners are entitled to receive benefits in accordance with the protective conditions contained in the 1980 order. We remand to the Commission for a computation of benefits.

The reasons for our decision are as follows:

(1) *The FTC employees are entitled to protective conditions under 49 U.S.C. § 11347 (1984). That section requires the Commission "to provide a fair arrangement * * * protective of the interest of employees who are affected by the transaction * * *."* [1]

The history of protective provisions for employees of merging or consolidating rail carriers is recounted in *New York Dock Railway v. United States*, 609 F.2d 83, 86–90 (2d Cir.1979). In 1933, Congress enacted the Emergency Railroad Transportation Act which mandated a job freeze to guarantee the continued employment of employees of consolidating railroads. Because of the extreme effect this approach could have on operational efficiency, railroads and labor organizations agreed to a job security arrangement that provided bargaining and compensation protection to employees, but allowed the railroads to reduce their work force. That agreement was the Washington Job Protection Agreement of 1936 (WJPA). In 1940, Congress amended the Interstate Commerce Act to include, *inter alia*, a labor protective provision modeled on the WJPA, 49 U.S.C. § 5(2)(f). That section was extensively revised in 1978 and recodified at 49 U.S.C. § 11347.

On its face, section 11347 applies to those who are (1) employees of one of the railroads participating in the merger,[2] and (2) affected by the transaction. There is no doubt that the FTC employees were affected, i.e., "touched significantly," by the BN-Frisco merger. *See Railway Labor Executives' Assoc. v. United States*, 216 F.Supp. 101, 102 (E.D.Va.1963). After the merger, BN had two motor carriers operating under auxiliary-to-rail restrictions. Both companies serviced its rail business. After the deregulation of the carrier industries, BN had several options with respect to its motor carrier subsidiaries. It chose to expand the certificated authority of one of its motor carrier subsidiaries at the expense of the other. It expanded BN Transport's authority and FTC, still burdened by its traditional rail-related restrictions, was unable to effectively compete. If FTC had not been made a subsidiary of BN as a result of the merger, BN could not have phased out FTC to make room for its other motor carrier subsidiary.

1. 49 U.S.C. § 11347 provides in its entirety:
    When a rail carrier is involved in a transaction for which approval is sought under sections 11344 and 11345 or section 11346 of this title, the Interstate Commerce Commission shall require the carrier to provide a fair arrangement at least as protective of the interest of *employees who are affected by* the transaction as the terms imposed under this section before February 5, 1976, and the terms established under section 565 of title 45. Notwithstanding this subtitle, the arrangement may be made by the rail carrier and the authorized representative of its employees. The arrangement and the order approving the transaction must require that the employees of the affected rail carrier will not be in a worse position related to their employment as a result of the transaction during the 4 years following the effective date of the final action of the Commission (or if an employee was employed for a lesser period of time by the carrier before the action became effective, for that lesser period). Pub.L. 95–473, Oct. 17, 1978, 92 Stat. 1439. [Emphasis added.]

2. The provision generally does not cover employees of other railroads which might be affected by the merger. *Lamoille Valley Railroad v. Interstate Commerce Commission*, 711 F.2d 295, 323 (D.C.Cir.1983); *Missouri-Kansas-Texas Railroad v. United States*, 632 F.2d 392, 412 (5th Cir.1980).

Thus, FTC employees are clearly employees affected by the transaction.

■ They were also employees of Frisco, a participant in the merger. The Commission has "long considered that a carrier and its subsidiaries constitute a single transportation system with respect to transactions under section 5 of the Act." *Pennsylvania Railroad Company-Merger-New York Central Railroad,* 347 I.C.C. 536, 546 (1974) (citing *Louisville & J.B. & R. Co. Merger,* 290 I.C.C. 725, 733; 295 I.C.C. 11; *Woods Industries, Inc.-Control-United Transports, Inc.,* 85 M.C.C. 672, 675). As the Commission noted in *Pennsylvania Railroad,* "the parent, by reason of ownership, has the legal right to direct the affairs of the subsidiaries and the latter have no alternative but to accept this direction, even if such were to result * * * in complete abandonment of the subsidiaries' operations or the extinction of their corporate existence." *Id.* at 547. The Commission concluded in that case that the Act's mandatory protective provisions covered employees of rail carrier subsidiaries.

The Commission does not seem to contest the above conclusions; rather it contends that a third condition must be met before section 11347 is applicable—the employees of the railroad must also be railroad employees, that is, work for the railroad itself or a rail carrier subsidiary. Although section 11347 contains no such explicit condition, the Commission refers to the previous version of that provision, 49 U.S.C. § 5(2)(f). Section 5(2)(f) directed the Commission to "require a fair and equitable

arrangement to protect the interests of the *railroad employees affected.*" (Emphasis added.)[3] In *Pennsylvania Railroad-Merger-New York Central Railroad, supra,* 347 I.C.C. at 549, the Commission interpreted this phrase to mean that mandatory protective provisions did not extend to employees of non-rail subsidiaries. In the instant case, the Commission argues that because Congress only meant to clarify section 5(2)(f) by the rewording in section 11347 and not effect any substantive change, we should read the same restriction into the revised provision.

Congress amended section 5(2)(f) by substituting "employees who are affected by the transaction" for "railroad employees affected." We are hesitant to read into the revised provision the interpretation argued for by the Commission. If Congress meant for section 11347 to apply only to employees who worked for rail carriers and not all the employees affected by the merger, the clearest way to express this restriction would have been to leave the relevant language in section 5(2)(f) as it was.

■ We need not resolve this question of interpretation because we believe, in the circumstances of this case, that the FTC employees are "railroad employees" within the meaning of the Act. Supreme Court and Commission decisions have traditionally limited a railroad's authority to operate motor carrier companies to auxiliary-to-rail services unless special circumstances warranted expanded authority. *See American Trucking Associations v. United States,*

---

**3.** 49 U.S.C. § 5(2)(f) provides:

(f) As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission shall require a fair and equitable arrangement to protect the interests of *the railroad employees affected.* In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the

protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this chapter and chapters 8 and 12 of this title, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees. [Emphasis added.]

364 U.S. 1, 6, 80 S.Ct. 1570, 1574, 4 L.Ed.2d 1527 (1980); *American Trucking Associations, Inc. v. I.C.C.,* 722 F.2d 1243, 1244–1247 (5th Cir.1984) (history of the auxiliary-to-rail restriction); *Rock Island Motor Transit Co. Com. Car. Application,* 63 M.C.C. 91 (1954). The Commission determined both in the Merger Order and the Reopening Order that FTC's operations were generally restricted to service which was auxiliary to or supplemental to the Frisco rail service. FTC can thus be viewed as a part of Frisco's and, after the merger, BN's, single transportation system. FTC was intimately tied to the railroad's main transportation function, in contrast to subsidiaries which are non-transportation oriented such as warehouse and mining enterprises. FTC employees should therefore be considered railroad employees.

The Commission objects to this line of reasoning, pointing out that employees of merging motor carrier companies are treated differently under the Act than employees of railway companies. Section 11344(b) of the revised Act covers motor carrier mergers. It requires the Commission to "consider the interest of carrier employees affected by the transaction." 49 U.S.C. § 11344(b) (1984). Courts have recognized that the Commission has more discretion under this section in fashioning protective conditions for affected employees than it has under section 11347. *See Walters v. Roadway Express, Inc.,* 557 F.2d 521, 523 n. 2 (5th Cir.1977); *American Buslines, Inc. v. United States,* 253 F.Supp. 481, 483 (D.D.C.1966); *Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America v. United States,* 221 F.Supp. 958 (D.D.C.1963) (applying statutory predecessors 49 U.S.C. §§ 5(2)(c) and 5(2)(f)). The rationale for this distinction is that motor carrier employees do not need as much protection because their skills are more transferable than

those of railway employees. *American Buslines, Inc. v. United States, supra,* 253 F.Supp. at 483.

The Commission cites these cases to support the proposition that section 11347 and its predecessor section 5(2)(f) have been consistently interpreted to exclude motor carrier employees. While we realize the Commission's interpretation should be given great weight, *e.g., Perkins v. Matthews,* 400 U.S. 379, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971), we think the Commission is clearly wrong. None of the cited cases involves motor carrier subsidiaries of railroads which exclusively operate auxiliary-to-rail services. The transactions in those cases were between motor carriers and were thus clearly covered by section 11344(b).[4] Here, however, the transaction is a merger between two railroads and the motor carrier in question is a part of one of the merging railroad's overall transportation system. Moreover, there is no evidence in the record that the skills of FTC's employees were transferable to general motor carrier services. Under the facts and circumstances of this case, we think section 11347 governs protective conditions for FTC employees.

▮ (2) *Even if it is assumed that the Commission has discretion to grant or deny protective conditions to employees of motor carriers operating at the time of merger as FTC did here, under the facts and circumstances of this case, it was an abuse of discretion not to grant the FTC employees the same protective conditions granted to Frisco's other railroad employees.*

In the BN-Frisco merger proceedings, officials of the BN and the Frisco stated that only a few employees of either company would be adversely affected by the merger and that those that were affected would be protected by standard employee protective

**4.** *Walters v. Roadway Express, Inc.,* 557 F.2d 521 (5th Cir.1977), involved the merger of two motor carrier companies. *American Buslines, Inc. v. United States,* 253 F.Supp. 481, 483 (D.D.C. 1966), consolidated three cases, involving the purchases of busline and motor carrier compa-

nies by other such companies. *Amalgamated Association of Street, Electric Railway and Motor Coach Employees of America v. United States,* 221 F.Supp. 958 (D.D.C.1963), involved the purchase of one busline by another.

conditions. The assurances were not limited to employees of the parent companies, BN and Frisco, nor were employees of the FTC told that they would not be protected. Thus no employee of the FTC had reason to seek to intervene in the merger proceeding or to request his union to do so. Moreover, specific assurances were given that there would be no change in the operation or services to be provided by the FTC.

Louis W. Menk, Chairman of the Board and Chief Executive Officer of BN, filed a verified statement with the Commission as a part of the merger application. He stated:

> The public interest also involves the potential impact on the employees of the two companies. Overall, because of the higher traffic volumes, it is expected that there will be a slight increase in employment over that of the two roads in 1976. * * * *I would like to emphasize* that, because of labor protective conditions, *no employee will face involuntary unemployment as a direct result of this merger without ample financial protection.*

Verified Statement of L.W. Menk, pp. 11–12 (emphasis added).

R.C. Grayson, Chairman, Chief Executive Officer and President of Frisco, also filed a verified statement with the Commission as part of the merger application. He stated:

> *The increases in traffic after 3 years will result in a slight increase in employment because of increased needs, especially in the states served by Frisco.* * * *

> This end-to-end merger should not result, or in itself, decrease the number of competitors anywhere. Single line service will provide financial strength and should enhance competition and aid the industry in its competitive struggle with motor carriers, water carriers, and pipelines. The effect on employment will be minimal with some reductions and transfers, primarily in the headquarters and other staff functions. Because of the end-to-end merger, reductions generally will occur through attrition and increases in employment will primarily be in the operating area necessitated by increased traffic volume. *In fact, by three years after merger, the number of jobs on the combined system will have actually increased.*

Verified Statement of R.C. Grayson, pp. 8 & 20 (emphasis added).

Additional verified statements relating to employee protection were filed by the following:

M.M. Donahue, Vice President of BN:

> The proposed merger will improve the quality and efficiency of rail service offered to our shippers, *produce no long-term adverse impact on our employees*, increase the rate of utilization and productivity of our human and physical assets, and will increase the financial strength of the consolidated company to a level exceeding that achievable by the two companies standing alone. *The beneficiaries will include * * * the railroad industry, and the merged company's employees* and owners.

> The estimated financial benefits to the merged company will total $32.5 million in the third year of operation. * * * Of course, these benefits will be diminished during the early years of merged operation when payments will be made to offset the adverse impacts *on our employees.*

> * * * * * *

> In any merger, there is some reduction in the work force of the predecessor companies. In the conduct of our merger studies, we were careful to identify potential adverse impacts on our employees. We then undertook an analysis of the protective payments and such related costs as those associated with employee transfers. Based on our analyses, it is estimated that the employee protective payments will total $16.0 million during the first year of merged operation, $7.8 million the second year, and $4.6 million the third year (in 1976 dollars).

Verified Statement of M.M. Donahue, pp. 3 & 12 (emphasis added).

C.M. Illg, Assistant Vice President-Labor Relations of BN:

The proposed merger of BN and Frisco is entirely end-to-end in nature with only two common points (St. Louis and Kansas City). The primary purpose of the merger is to improve the quality and efficiency of the rail services offered to our shippers, rather than elimination of duplicate routes and redundant facilities. Therefore, *while any merger of two companies requires some realignment of forces, this transaction is not intended to result in substantial permanent reductions in employment.* * * *

*With the exception of clerical employees at Springfield, it is expected that the bulk of surplus employees created at any point and in any craft will be absorbed almost immediately on new positions and other vacancies caused by employees leaving service in the normal course of events,* and by the demands of increased traffic. Even at Springfield, where it is contemplated that a net surplus of clerical employees will result, the anticipated increased business indicates that opportunities will exist for retraining most of these surplus clerical employees for new careers in other crafts.

*Those employees who do become surplus, or are displaced or are transferred due to the transaction, will be covered by protective benefits.* * * * Since it is not practicable to pursue the kind of negotiations necessary to reach protective agreements with the employee representatives prior to submitting this application, and the ultimate success of any such negotiations depends upon the ability of many parties to reach mutually satisfactory arrangements, appropriate conditions to protect the interest of the employees to be imposed by the Commission must be considered. In light of the relatively limited impact that the proposed transaction will have on the employees, they will be adequately protected by the protective conditions provided for in Section 5(2)(f) of the Interstate Commerce Act, and the cost of protective benefits shown in Table B of Exhibit 10(iii), (iv) and (v) for employees represented by unions adversely affected by this transaction has been based on the assumed imposition by the Commission of those conditions.

Verified Statement of C.M. Illg, pp. 4–6 (emphasis added).

At the time the application for merger of the BN and Frisco was submitted, a supplement to that application was also submitted. In describing that supplement, the BN stated:

At the request of the Commission, we are filing herewith a supplement to the above-captioned application. The purpose of the supplement is to provide data called for in Commission Form OP-F-45 concerning the Frisco Transportation Company, a wholly owned motor carrier subsidiary of the St. Louis-San Francisco Railway Company. This supplementary information is being provided since, if the rail merger sought in the above-captioned application is approved and consummated, Burlington Northern, Inc. would then also acquire control of Frisco Transportation Company.

Burlington Northern Letter to Mr. Marvin Bober, Assistant Deputy Director, Interstate Commerce Commission, dated January 13, 1978.

The supplement stated:

With respect to all information required as Appendix D, see the Joint Application generally Section 1111.1(a) through (e) and exhibits. With respect specifically to Appendix D–7, *no changes are proposed in the operation of FTC.* No control will be obtained unless the rail merger proposed in the Joint Application is approved and consummated. Should that occur, *FTC operations will continue in the same manner as at present and will bear the same relationship to Frisco rail operations as they do now.* Thus BN as successor to Frisco will be enabled to use service by motor vehicle to public advantage in its operations to the same extent and in the

same manner as Frisco does today. Neither will there be any change in the competitive relationships with respect to other motor carriers nor will competition be unduly restrained. *If any consolidation with BN's motor carrier subsidiary is proposed in the future, a separate application will be filed with the Commission at that time.*

Supplement to Application, Finance Docket No. 28583 Sub No. 1, dated January 13, 1978, pp. 1, 6–7 (emphasis added).

■ No studies were made by the BN or its transportation company as to the effect of the acquisition of the control of the FTC by the BN. In response to questions, an officer of the BN Transportation Company stated:

Q [Questioning of Mr. Thomas.] * * The witnesses for the railroad have testified to various [studies], effects of the merger between BN and Frisco. Were any studies made by you or your transportation company as to the effect of the acquisition of the control of the Frisco Transportation Company by the BN?

A Not to my knowledge, no, sir.

Q You have no knowledge of how that acquisition will affect your operation?

A I know to this extent, that we are not engaged in any merger. It would be merely a change in ownership and therefore, we had no merger study per as with BN Transportation or BN, Inc., or anybody else.

Q You assume, do you, that your operations will be conducted in the future as they are in the present?

A Absolutely.

\* \* \* \* \* \*

Mr. Olsen. Your Honor, I would like to point out that all the material in the supplementary application which pertains to acquisition of control of Frisco Transportation Company, all of the material in this application with respect to Burlington Northern is taken out of the rail merger application or out of our R-1 reports to the Commission. *There is nothing in there beyond that other than the simple policy statement that*

*no change will be made in the operation of Frisco Transportation.*

Tr. 3453–3459 (emphasis added).

In the light of these facts, we cannot agree with the Commission that the petitioners waived their right to receive the benefits of the protective condition by not intervening. They had a right to rely on the representations that were made by the officers of BN and Frisco. Moreover, the petitioners offered to provide evidence of additional personal reassurances from Frisco officials that their jobs would be safe, but the Commission declined to receive this evidence. It can hardly be heard now to say that they waived their rights by not taking an active role in merger proceedings.

## SUMMARY

In our view, the FTC employees are entitled to the benefit of the protective conditions heretofore made available to the employees of the BN and the Frisco because they are employees who were affected by the merger within the meaning of the Act; and, alternatively, because it was an abuse of discretion on the part of the Commission to deny them benefits in light of the representations made by the railroads at the time of the merger.

Reversed and remanded.