930 F.2d 748
 137 L.R.R.M. (BNA) 2136
 George W. LANDIS; Larry R. Gralish; Paul Van Blaricom &
Any and All Other Exempt Employees of Burlington Northern
Entitled to the Labor Protective Conditions of Northern
Lines, 331 ICC 228 (1967), Plaintiffs-Appellants,
v.
BURLINGTON NORTHERN RAILROAD COMPANY, a corporation; United
States of America; Interstate Commerce
Commission, Defendants-Appellees.
 No. 89-35455.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 8, 1990.
Decided April 16, 1991.
 
 Owen Wales, Seattle, Wash., for plaintiffs-appellants.
 Richard Schreiber, Steptoe & Johnson, Chicago, Ill., for defendant-appellee Burlington.
 John S. Koppel, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee, U.S.
 Appeal from the United States District Court for the Western District of Washington.
 Before TANG, NELSON and CANBY, Circuit Judges.
 TANG, Circuit Judge:
 
 
 1
 Upon his termination from Burlington Northern Railroad ("BN"), George W. Landis challenged BN's computation of his severance salary. An Interstate Commerce Commission ("ICC") order guaranteed Landis' severance salary. After referral to the ICC, the district court adopted the ICC's interpretation of the merger guarantee and granted summary judgment to BN. The district court also denied Landis recovery of attorney's fees. Landis appeals, and we affirm.
 
 FACTS AND PROCEEDINGS
 
 2
 Under 49 U.S.C. Sec. 11347, the ICC cannot approve a railroad merger unless "a fair arrangement" protects employees affected by the merger. In 1967, the ICC approved a railroad merger resulting in the BN Railroad. Great Northern Pacific & Burlington Lines, Inc.--Merger--Great Northern Ry., 331 I.C.C. 228, 276-79 (1967), aff'd. 296 F.Supp. 853 (D.D.C.1968), aff'd., 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970) [Northern Lines ]. As a condition of ICC approval of the merger, the ICC adopted for all affected employees the collective bargaining agreement protections the railroads had negotiated for union employees. Id. at 278. Those protections included guaranteed compensation for the rest of an employee's working life upon any reduction in force. Great Northern Pacific & Burlington Northern Lines--Merger--Great Northern Ry., Finance Docket No. 21478 (sub. no. 6), 2-3 (Nov. 25, 1986) [Landis I ]. Under the collective bargaining agreements, BN must determine the guaranteed compensation by calculating each employee's base salary as of 1970, the year of the merger, and then adding "the percentage of future general wage increases" the employee had received since the merger. Id. (quoting collective bargaining agreements). Neither the agreements nor the ICC defined "general wage increases." Id.
 
 
 3
 For fifteen years after the 1970 merger, BN avoided having to pay the guaranteed salaries by providing an early retirement incentive program and by relying on attrition. Great Northern Pacific & Burlington Northern Lines--Merger--Great Northern Ry., Finance Docket No. 21478 (sub. no. 6), 6 (Apr. 5, 1988) [Landis II ]. In 1985, however, BN reduced its force substantially and abolished, among others, Landis' position as a tax agent in BN's Seattle offices. Id. Landis' position was nonunion. Id. Termination of Landis' and others' positions triggered the merger protections BN had avoided until then. BN therefore calculated Landis' 1970 base salary and added percentages of four "general wage increases" that all nonunion employees such as Landis had received since the merger. Landis I at 4. At termination, Landis was receiving $3,730.00 per month, but under BN's interpretation of the merger guarantee, Landis would thereafter receive $1,090.00 per month. Landis I at 4.
 
 
 4
 Landis filed suit in federal district court in August 1985 alleging, among other claims, that BN had failed to comply with the ICC's 1967 merger order by including in Landis' guaranteed salary only those four increases. In September 1985, the district court stayed proceedings and, under the doctrine of primary jurisdiction, referred this issue to the ICC. See United States v. Yellow Freight System, Inc., 762 F.2d 737, 739-41 (9th Cir.1985). Neither party contests that referral.
 
 
 5
 In November 1986, the ICC ruled that BN's calculations of Landis' guaranteed salary had violated the merger conditions. Landis I at 5. The ICC did not, however, adopt Landis' position. Landis had argued that his 1985 salary accurately reflected the merger guaranteed salary because it included all "general wage increases" received between 1970 and the 1985 termination. Id. Instead, the ICC ordered the parties to submit additional evidence on the proper application of the "general wage increase" guarantee. Id. at 11.
 
 
 6
 After consideration of the additional evidence, the ICC ruled on April 5, 1988 that it could not determine from the evidence available from BN which pay increases were properly included in guaranteed salaries as "general wage increases." Landis II at 6. The ICC then decided that the Consumer Price Index "is a reasonable surrogate to reflect 'general wage increases.' " Id. at 7. The ICC ruled that the merger guarantee thus required application of the Consumer Price Index ("CPI") to all nonunion employees' base salaries to account for the unascertainable "general wage increases." The ICC's ruling resulted in a guaranteed salary of $2,412 per month for Landis, more than he received under BN's calculations, but about $1,400 less than he was receiving upon termination. See Landis II at 8.
 
 
 7
 Upon remand to the district court, Landis challenged the ICC's Landis II decision adopting the CPI as a surrogate, and he joined the ICC as a party defendant. All parties moved for summary judgment. On March 29, 1989, the district court granted partial summary judgment to affirm both Landis I, holding BN had violated the merger guarantee, and Landis II, adopting the CPI to calculate "general wage increases." Landis moved for reconsideration, which the district court denied on May 18, 1989. Landis also moved for an award of attorney's fees under 49 U.S.C. Sec. 11705(d)(3). The district court denied that motion July 26, 1989. Landis appeals.
 
 STANDARD OF REVIEW
 
 8
 This court reviews de novo the district court's grant of summary judgment to BN and the ICC affirming Landis I and Landis II. Kruso v. Int'l. Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). Upon review, this court employs the same standards the trial court used. Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986). The instant case requires standards appropriate to the review of ICC rulings. This court may "set aside a ruling of the ICC only if its findings or conclusions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, in excess of statutory jurisdiction, authority, or limitations, or short of statutory right or unsupported by substantial evidence." Gray Lines Tour Co. of Southern Nev. v. ICC, 824 F.2d 811, 813 (9th Cir.1987) (citing 5 U.S.C. Sec. 706(2)(A), (C), (E)).
 
 DISCUSSION
 I. The ICC's Decision
 
 9
 A. Construction of "General Wage Increases"
 
 
 10
 Landis first argues that the ICC's decision is arbitrary, capricious, or otherwise unlawful because, by adopting the Consumer Price Index ("CPI") as a surrogate for "general wage increases," the ICC impermissibly rewrote the private contract terms of BN's collective bargaining agreements. Citing hornbook principles of contract construction, Landis criticizes the ICC's adoption of the CPI as contrary to the letter and intent of those private contracts.
 
 
 11
 We disagree with Landis' analysis. The ICC draws its authority to adopt private contract terms and to construe them as ICC orders from the Supreme Court's decision in Norfolk & Western Ry. v. Nemitz, 404 U.S. 37, 43, 92 S.Ct. 185, 189, 30 L.Ed.2d 198 (1971). The ICC properly adopted the "general wage increase" term as its own condition for the merger. See id. That fact, however, does not free the ICC from the need to determine the meaning of the term as applied to salaried employees like Landis, whose pay increases include a substantial merit factor. The ICC did not act in an arbitrary, capricious, or otherwise unlawful manner in construing its adopted term, "general wage increase," to have a different effect on Landis than it would have as a matter of contract on employees whose wages were governed by the collective bargaining contract.
 
 B. ICC Jurisdiction
 
 12
 Landis also indirectly raises a jurisdictional objection to the ICC ruling. In rejecting contract interpretation as the appropriate analysis for the disputed term, the ICC also decided against referring the dispute to arbitration. The ICC rejected arbitration even though BN's contracts and the ICC's Northern Lines merger order both require arbitration for disputes between BN and its employees. See Northern Lines, 331 I.C.C. at 278-79. Landis seems to view the issue in this case narrowly as a labor agreement dispute.
 
 
 13
 An earlier ICC decision, Leavens v. Burlington Northern, 348 I.C.C. 962 (1977), helps define the contours of ICC jurisdiction, distinguishing between arbitrable private contract disputes and ICC interpretation of merger conditions. We apply Leavens in this case because the decision is consonant with the Supreme Court's ruling in Nemitz, with the ICC's statutory authority under 49 U.S.C. Sec. 11347, and with the policy of the ICC refraining from unnecessarily interfering in labor relations. See Leavens, 348 I.C.C. at 975, (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)).
 
 
 14
 Under the Leavens analysis, the ICC retained jurisdiction to interpret the "general wage increase" provision at issue here. First, Leavens requires that the disputed provision be a facet of compensation guarantees under an ICC-approved merger in order to come under ICC jurisdiction. Id. at 976. The "general wage increases" provision, as the parties agree, certainly satisfies that requirement. Second, Leavens requires that the ICC have adopted the provision "to protect against a specific merger-related harm." Id. The "general wage increases" provision here helps protect employees from the consequences of reductions in force resulting from the merger, and so satisfies this second requirement for ICC jurisdiction.
 
 
 15
 Finally, Leavens requires that the ICC decline jurisdiction over all other alleged violations of the collective bargaining agreement. Id. Where the machinery of collective bargaining provides a remedy for a labor dispute, not the ICC, but "those with the greatest expertise will be the ones to settle any disputes that are not merger related." Id. Landis' dispute, however, is wholly merger related, centering entirely on the merger conditions. Landis' case therefore falls squarely within the ICC's retained jurisdiction to enforce its merger orders, and it implicates no conflict with national labor policy respecting collective bargaining.
 
 C. Conditions for Merger Approval
 
 16
 Landis argues that the ICC's adoption of the CPI as a surrogate for calculating "general wage increases" is arbitrary, capricious, or otherwise unlawful because it fails to satisfy the ICC's own conditions for approval of the BN merger announced in Northern Lines. Landis points first to the Northern Lines requirement that the merger not result in his "being placed in a worse position" than if no merger had occurred. See Northern Lines, 331 I.C.C. at 278. Calculations relying on the CPI of Landis' guaranteed salary result in a monthly salary about $1,400 less than Landis was receiving upon termination. Therefore, Landis argues, contrary to the Northern Lines requirement, adoption of the CPI does not prevent Landis from "being placed in a worse position" because of the merger. Second, Landis points to the Northern Lines requirement that union and nonunion employees receive "equivalent" treatment. See Landis I at 5. The ICC ordered use of the CPI for calculation only of nonunion guaranteed salaries, and not for union salaries. Therefore, Landis argues, contrary to the Northern Lines requirement, adoption of the CPI prevents "equivalent" treatment of union and nonunion employees. We disagree.
 
 
 17
 The ICC defined "general wage increases" as encompassing only "economic adjustments" and as excluding "merit increases." Landis II at 6. Because Landis' 1985 salary at termination included merit or other "noneconomic" increases, it did not reflect only "general wage increases" as defined by the ICC. The ICC definition thus undermines Landis' arguments for his 1985 salary as the appropriate measure of his guaranteed salary. Moreover, the definition defeats Landis' arguments for equivalency with union employees. The ICC found that, under BN's system, union salary increases reflected the noneconomic components of collective bargaining "trade-offs," while nonunion salary increases reflected the noneconomic components of merit increases. Id. at 8. Unable to isolate purely "economic" increases as its definition of "general wage increases" requires, the ICC ruled that "the treatment of union and non-union employees" need only "approach[ ] a reasonable degree of equivalency." Id.
 
 
 18
 The ICC's definition of the "general wage increase" guarantee thus disposes of Landis' invocation of the Northern Lines conditions. We conclude, moreover, that the ICC's definition of "general wage increases" as including only "noneconomic" increases fulfills the Northern Lines conditions for merger approval. Given the vagueness of the term "general wage increases" and the lack of controlling applicable law, the ICC's definition is reasonable. We therefore defer to the ICC's definition of its own term of art. See Lambert v. FDIC, 847 F.2d 604, 606 (9th Cir.1988) ("agency's interpretation of its own regulation is entitled to a high degree of deference if it is not unreasonable") (citations omitted).
 
 II. Evidence Supporting the ICC's Decision
 
 19
 Landis argues that substantial evidence fails to support the ICC's adoption of the CPI as a surrogate for the "general wage increases" provision. He points out that no evidence was available for quantifying actual BN general wage increases, and that his evidence showed the CPI was too low a factor. Again, however, the ICC's definition of "general wage increases" defeats Landis' claim. Where neither party could supply satisfactory evidence of actual BN "general wage increases," the ICC reasonably attempted to identify a surrogate. In choosing the CPI, the ICC relied on substantial testimony from both parties' witnesses stating that the CPI isolated the "economic" factors the ICC had required in its definition of "general wage increases." After careful review of the record, we conclude that substantial evidence supports the ICC's choice of the CPI as a surrogate.
 
 III. Attorney's Fees
 
 20
 Landis points out that his court complaint alleged BN's violation of the ICC's Northern Lines order mandating his guaranteed salary. Upon referral to the ICC, that agency indeed concluded that BN's compensation to Landis failed to satisfy the Northern Lines requirements. Landis I at 5. Thus, Landis argues, he is entitled to attorney's fees incurred in successfully seeking enforcement of the Northern Lines ICC order against BN. See 49 U.S.C. Sec. 11705(a) (action to enforce an ICC order); 49 U.S.C. Sec. 11705(d)(3) (recovery of fees and costs). We disagree.
 
 
 21
 The statutory mandate for attorney's fees assures full recovery to plaintiffs seeking court enforcement of an ICC order. 49 U.S.C. Sec. 11705(d)(3). Landis does not contend that BN ignored the ICC's Northern Lines order. Rather, the parties disputed how BN attempted to comply. Though the ICC held in Landis I that BN had not fully complied with the Northern Lines order, it did not agree with Landis' interpretation either. Landis II finally determined a vague condition in Northern Lines for "general wage increases," and BN promptly complied. Moreover, by the statute's explicit terms, an award of attorney's fees is contingent on a carrier's liability in court for "damages." 49 U.S.C. Sec. 11705(d)(1), (3) (emphasis added). Because BN did not contest Landis I and helped to defend Landis II successfully in court, it does not appear that Landis won "damages" from BN in court. Landis failed to show BN's liability in court. We therefore affirm the district court's denial of fees and costs to Landis.
 
 CONCLUSION
 
 22
 We affirm the district court's grant of summary judgment to the ICC and BN approving Landis I and Landis II. Further, we affirm the district court's denial of attorney fees and costs to Landis. The judgment of the district court is thus
 
 
 23
 AFFIRMED.