William A. RILLING, Plaintiff–Appellant,

v.

**BURLINGTON NORTHERN RAILROAD COMPANY, Defendant–Appellee.**

No. 93–35222.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 9, 1994.

Decided Aug. 1, 1994.

---

Owen J. Wales, Seattle, WA, for plaintiff-appellant.

Laurence H. Schecker, Interstate Commerce Com'n, Washington, DC, for defendant-appellee.

Kurt W. Kroschel, Kroschel & Gibson, Bellevue, WA, for defendant-appellee.

Before: POOLE, BRUNETTI and KLEINFELD, Circuit Judges.

## OPINION

KLEINFELD, Circuit Judge:

William Rilling seeks to escape the effect of a settlement agreement he made with Burlington Northern. Burlington Northern had not told him when he signed the settlement that it was being sued in another action by a similarly situated plaintiff. The other plaintiff won, after Rilling had settled. We affirm the District Court decision holding Rilling to his agreement.

### Facts

In 1967, the ICC approved the proposed merger of several railroads into the Burling-

ton Northern Railroad. When the ICC approved the merger, it provided employment protection to the railroad workers, pursuant to what has since become 49 U.S.C. § 11347 (1988). *Northern Lines,* 331 I.C.C. 228 (1967), *aff'd* 296 F.Supp. 853 (D.D.C.1968), *aff'd* 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970). This law, and the ICC merger approval order, gave the employees attrition protection and guaranteed compensation in the event of reductions in force. Basically, this meant that employees were entitled to continue to get paid, even if their jobs no longer existed, for the rest of their working lives. The guaranteed pay would be what they were receiving in 1970 when the merger order became final, plus economic adjustments, but excluding merit increases. *See Brotherhood of Maintenance of Way Employees v. United States,* 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961); *Landis v. Burlington Northern R.R. Co.,* 930 F.2d 748, 752–53 (9th Cir.1991). This would generally be less than the employee's salary at the time he was laid off.

Rilling's position was eliminated in 1986 during a general staff reduction, when he was four years short of retirement eligibility. Burlington Northern told him that as it interpreted the labor protective rights under the order, he would be entitled to his 1970 salary plus four general wage increases since then, amounting to $1,005 per month. Rilling was nonunion, and Burlington Northern interpreted the order to require a different and less favorable computation for nonunion than for union employees.

Burlington Northern offered, and Rilling accepted, a substitute for the $1,005 per month. He could waive continuing compensation under the ICC order and instead take a lump sum equal to six months of his $3,535 current salary, amounting to $21,129, plus continuing medical and life insurance coverage and pension credit until his retirement date. The document he signed, in 1986, recited in plain language that in exchange for the lump sum and benefits, he relinquished "any rights I might have to (1) employee protection prescribed as a result of the Interstate Commerce Commission decisions."

Burlington Northern did not tell Rilling that another employee, Landis, currently was claiming before the ICC that its method of computation was incorrect. Seven months after Rilling made his agreement, the ICC issued an order in *Landis I.* That order required that nonunion employees' compensation be computed in the same manner as union employees. Even though Rilling had already settled, he was given the benefit of this decision. Burlington Northern then paid Rilling an additional six months lump sum pay, which was equal to the difference he would have received had he been union.

A subsequent decision in the *Landis* case came down two years after Rilling's settlement. *Landis II* held that the nonunion employees were also entitled to Consumer Price Index inflation adjustments in determining their continuing compensation. Under *Landis II,* had Rilling chosen continuing compensation instead of a lump sum, he would have gotten more money. Burlington Northern refused Rilling's request for that additional sum, holding him to the release agreement he had signed.

Rilling sued Burlington Northern in District Court, claiming that Burlington Northern had procured the release by fraud and had breached it, so he was entitled to the pay he would have received if he had never signed the agreement, and had continued to work at his old job. The attack on the release was based on the theory that when Burlington Northern told Rilling it owed him his 1970 wage plus general wage increases, it did not tell him about the Landis lawsuit. Rilling claims Burlington Northern thereby told a half truth, so the release was procured by fraud. He also argued that the release was invalid regardless of fraud because it abrogated his rights under the labor protective provisions of the ICC merger approval order.

Rilling lost on summary judgment, but we reversed. Our reversal was not on the merits of the contract or fraud claims. We held that the ICC had primary jurisdiction to interpret its merger approval order and determine the validity of the release. We directed that the validity of the release should be determined in the first instance by the

ICC. *Rilling v. Burlington Northern R.R. Co.*, 909 F.2d 399, 401 (9th Cir.1990). We identified two questions for which the ICC had primary jurisdiction: (1) whether the release was invalid as an agreement to vary labor protective provisions of the ICC merger approval order; (2) whether the release should receive the "searching scrutiny" of failures to disclose afforded seamen and 42 U.S.C. § 1983 plaintiffs, or some lesser level of scrutiny. *Id.*

The ICC held that Rilling's release "does not vary the terms of, but rather comports with" the labor protection requirements of the merger order. *In re Rilling*, 8 I.C.C.2d 229, 238 (1991). With regard to the level of scrutiny, the ICC held that Burlington Northern "has a duty to deal fairly with its employees" which is "a continuing obligation." *Id.* at 240. The standard of scrutiny the ICC adopted for allegations of misrepresentation was borrowed from *Cosby v. I.C.C.*, 741 F.2d 1077 (8th Cir.1984). The ICC held that "the standard in rail cases for analyzing allegations of misrepresentation, such as here, is whether there has been a showing of an affirmative misrepresentation of a material element, followed by detrimental reliance by the employee." *Rilling*, 8 I.C.C.2d at 241. The ICC understood our opinion to ask only for its view of the standard to be applied, not a resolution of whether Burlington Northern had breached its duty to deal fairly with Rilling.

The case then went back to the District Court on Rilling's petition for review of the ICC order pursuant to 28 U.S.C. § 1336 (1988). On cross motions for summary judgment, the district court affirmed the ICC order and granted summary judgment in favor of Burlington Northern. It found that the ICC's interpretation of its merger approval order was not arbitrary or contrary to law, and that Burlington Northern had dealt fairly with Rilling because it had made no affirmative misrepresentations to him.

## Analysis

### I. The merger order.

Rilling first argues that the settlement to which he agreed substantially abrogates his rights under the merger approval order, and so is invalid. For this proposition, he cites *Norfolk & Western R.R. Co. v. Nemitz*, 404 U.S. 37, 44, 92 S.Ct. 185, 189, 30 L.Ed.2d 198 (1971). That case construed the ICC's statutory duty to assure that collective bargaining agreements implementing labor protective orders do not "substantially abrogate" the orders. It did not deal with agreements between railroads and individual employees.

Rilling argues that his settlement puts him on leave of absence, but the merger order contemplates only death, retirement, discharge for cause or resignation. The ICC decided that Rilling's termination amounted to "resignation" under the labor protective order, and so comported with the order. As an independent ground for its decision, the ICC held that Burlington Northern could discharge an employee without cause, so long as the employee "is compensated at the appropriate level for the rest of his or her working life or agrees to a lump sum, as here." *Rilling*, 8 I.C.C.2d at 238.

■ We assume without deciding that the *Nemitz* rule against "substantial abrogation" applies to individual agreements settling claims for entitlement under labor protective orders, not just collective bargaining agreements implementing labor protective orders. We review the ICC interpretation of its own order deferentially to determine whether it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Landis*, 930 F.2d at 751; 5 U.S.C. § 706(2)(A) (1988).

■ We see nothing arbitrary or contrary to law about the ICC's determination that Rilling's agreement "does not vary the terms of, but rather comports with" the labor protection requirements of the merger order. The purpose of the statute which the ICC order implemented "was not to freeze jobs but to provide compensatory conditions." *Nemitz*, 404 U.S. at 42, 92 S.Ct. at 188. The release agreement called Rilling's status "leave of absence," but a reading of the entire agreement makes it clear that his work was to end, as with a resignation under the merger order. The agreement is set out

in full in the footnote.[1] The "leave of absence" is to last until his early retirement eligibility date, at which time he promises "to submit my resignation." Calling his departure until his retirement a "leave of absence" appears to be a device for continuing Rilling's medical insurance and pension accumulation even though he was not really working for Burlington Northern any more. It supplemented and implemented, rather than abrogated, his employee protective rights. We affirm the ICC determination that the release agreement "constitutes a 'resignation' within the express terms of the *Northern Lines* conditions." *Rilling,* 8 I.C.C.2d at 238.

## II. Disclosure.

■ We affirm the ICC determination regarding the scope of Burlington Northern's duty. Burlington Northern has a continuing duty to deal fairly with its employees. The standard "for analyzing allegations of misrepresentation, such as here, is whether there has been a showing of an affirmative misrepresentation of a material element, followed by detrimental reliance by the employee." *Rilling,* 8 I.C.C.2d at 241. The ICC expressly held that "[n]o heightened obligation exists or should be imposed on rail carriers." *Id.* Rilling has cited no authority for any different or higher duty, and we are aware of no reason why we should accept the ICC's formulation.

■ Application of this standard to the facts of the case is straightforward. Rilling submitted no evidence that Burlington Northern made an affirmative misrepresentation of a material element of the agreement. His claim was that Burlington Northern did not tell him about the *Landis* litigation, not that it told him something which was false.

Rilling argues that telling him what he was entitled to under the labor protective agreement, without also telling him another employee was suing for a more favorable interpretation, amounts to a misrepresentation because it is a half truth. This same argument, arising out of another Burlington Northern employee's lawsuit, was rejected in *Spitzmueller v. Burlington Northern R.R. Co.,* 740 F.Supp. 671 (D.Minn.1990), because the outcome of the pending litigation could not be known at the time the agreement was made. The ICC cited the *Spitzmueller* decision with approval in its formulation of the standard to be applied to Rilling's case. *Rilling,* 8 I.C.C.2d at 241.

1. REQUEST FOR LEAVE OF ABSENCE AND RELEASE AGREEMENT

I, William A. Rilling, hereby request a noncancellable and irrevocable leave of absence from my active employment status with Burlington Northern Railroad (BN) from May 1, 1986 to March 31, 1990, at which time I will be eligible to exercise my rights under BN's early retirement pension plan.

It is my understanding that while on such leave of absence I will (1) continue to accrue credited service as provided in Article 2, Section 11 of the BN pension plan, and (2) receive continuing group medical coverage under a BN sponsored third party arrangement and life insurance in the amount of $10,000, unless I obtain comparable coverage under any other group plan or, until the expiration of my leave of absence, whichever occurs first.

It is also understood that I will receive a separation allowance of $21,129.00, less applicable deductions as required by law, payable in two installments, 75% upon execution of this document and 25% at the time the leave of absence expires and I retire under BN's early retirement pension plan.

In return for favorable consideration of this request and in consideration for all the other obligations assumed by BN pursuant to this agreement, I am willing to knowingly and voluntarily relinquish any rights I might have to (1) employee protection prescribed as a result of the Interstate Commerce Commission decisions approving the *Northern Lines* (331 I.C.C. 228) or *Frisco* (360 I.C.C. 78) mergers or (2) under any federal, state or municipal law pertaining to employee rights or prohibiting employment discrimination.

I have had ample opportunity to review the facts and law relevant to any asserted or potential claims and have had the opportunity to consult fully and freely with counsel of my choice and have either done so or knowingly waived the right to do so.

It is my further understanding that at the expiration of this leave of absence I will qualify for participation in BN's early retirement pension program and I will proceed to submit my resignation and exercise my election to participate in such program and BN agrees to permit me to do so. It is mutually understood that this will maximize my entitlement to pension benefits under BN's early retirement pension program.

If an institutional litigant could not make agreements without surveying its files and disclosing any lawsuits pending on related theories or facts, a great additional burden of litigation cost and delay would clog settlements. Part of the cost would doubtless fall on the workers entering into the settlements. It is hard to imagine the railroad workers doing anything with the computer printouts of pending case names, except tossing them in the trash. As Judge Rosenbaum wrote in *Spitzmueller*, information about unresolved cases would generally be of little value:

> This would simply open more avenues for conjecture: are the cases really analogous? What is the chance of success? If the other case is decided adversely to the plaintiff, is the outcome "slightly" adverse or "significantly" adverse? Is the present benefit more advantageous than the hoped for outcome? Such musings make clear the emptiness of plaintiffs' proposed rule.

740 F.Supp. at 677. Rilling has not suggested that the outcome of the Landis litigation was known as a practical matter, or otherwise demonstrated that Burlington Northern as a practical matter knew that as soon as some paperwork was completed, Rilling would have been entitled to what Landis eventually won. We agree with the ICC's evident approval of the view that the railroad does not have to provide a list of pending lawsuits relating to the matter in order to make a binding agreement with its employee regarding labor protective rights under the merger agreement.

**AFFIRMED.**